**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| TUSHAWN CRAIG,<br>MARQUETTA STOKES,<br><br>          Plaintiffs,<br><br>     v.<br><br>CORNERSTONE TRADING GROUP, LLC,<br>SETH SMITH,<br>CITY OF RICHMOND, INDIANA,<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:23-cv-01575-TWP-MJD

| | |
|---|---|
| CITY OF RICHMOND, INDIANA,<br><br><br>          Cross Claimants,<br><br>     v.<br><br>CORNERSTONE TRADING GROUP, LLC,<br>SETH SMITH,<br>MY-WAY TRADING, INC.,<br><br>          Cross Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

| | |
|---|---|
| CORNERSTONE TRADING GROUP, LLC,<br><br>          Third Party Plaintiff,<br><br>     v.<br><br>CITY OF RICHMOND, INDIANA,<br><br>          Third Party Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ALLEN WELLMAN HARVEY KEYES
COOLEY, LLP,

          Interested Party.

<u>**ORDER ON PENDING SUMMARY JUDGMENT MOTIONS**</u>

This matter is before the Court on a Motion for Partial Summary Judgment filed by Defendant Seth Smith ("Smith") (Filing No. 232); a Motion for Summary Judgment on Plaintiffs' claims and the Third-Party Complaint filed by Defendant City of Richmond, Indiana (the "City") (Filing No. 237); and a Motion for Partial Summary Judgment on the City's Crossclaims against Defendants Smith, Cornerstone Trading Group LLC ("CTG"), and My-Way Trading, Inc. ("My-Way Trading") (these three together, "My-Way") filed by the City (Filing No. 252). Plaintiffs Tushawn Craig ("Craig") and Marquetta Stokes ("Stokes") (together, "Plaintiffs") initiated this lawsuit on behalf of themselves and all others similarly situated against the City, CTG and Smith (the latter two together, "Cornerstone") alleging damages for the Defendants' failure to exercise reasonable care in their engagement in ultra-hazardous activities which resulted in a catastrophic fire in their neighborhood (Filing No. 1-2 at 23–30). Thereafter, CTG filed a Third-Party Complaint against the City, *id*. at 69, and the City filed Crossclaims against My-Way (Filing No. 18). For the reasons discussed in this Order, Smith's Motion for Partial Summary Judgment is **denied**, the City's Motion for Summary Judgment on Plaintiffs' claims and the Third-Party claim is **granted in part and denied in part**, and the City's Motion for Partial Summary Judgment on its Crossclaims is **granted**.

## I.    <u>BACKGROUND</u>

When considering the facts on summary judgment, the court must consider the record as a whole, in a light most favorable to the non-moving party, and draw all reasonable inferences that favor the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Bay v. Cassens Transport Co.,* 212 F.3d 969, 972 (7th Cir.2000). In cases of crossclaims, courts assess each motion independently, applying this favorable view to the respective non-movant. Likewise,

with cross-motions, the court construes all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001)

## A.     **Factual Background**

In 2006, Smith, through his company My-Way Trading, began operating a plastics brokerage business at 308 NW F Street (the "308 Property") in Richmond, Indiana. In December 2006, My-Way Trading purchased the 308 Property (Filing No. 241 at 10). At that time, two neighboring parcels, 310 NW F Street (the "310 Property") and 358 NW F Street (the "358 Property") (collectively the "310/358 Properties"), were owned and operated by Hoffco/Comet Industries, Inc., who ceased operating the 310/358 Properties in 2010. *Id*. In 2012, My-Way began expanding its activities onto the 310/358 Properties without owning or leasing or otherwise obtaining written consent to do so. *Id*.

In May 2019, Doug Gardner ("Gardner"), the Deputy Chief of Fire Prevention for the City, inspected the 308 Property and the 310/358 Properties (Filing No. 251 at 8). Based on Gardner's inspection of the three properties, the City's Unsafe Building Commission ("Building Commission") issued orders to CTG and AFG Investment Fund[1] on July 24 and 25, 2019, to "[r]epair, [d]emolish, or [v]acate" the properties. *Id*. at 9.

The Building Commission held a hearing for the preliminary orders on September 24, 2019 (Filing No. 251-6 at 3 ¶8). It then issued orders finding the three properties "unsafe" and that the "cumulative effect of the code violations present" on the premises rendered "the premises unsafe, substandard, or a danger to the health and safety on the public as defined by I.C. § 36-7-

---

[1] AFG Investment Fund was the entity who owned the 310 and 358 Properties at the time the Building Commission orders were issued. Wayne County received the 310 and 358 Properties from AFG following a tax sale and the City subsequently took title to the properties via a quitclaim deed in March 2021 (Filing No. 251-6).

94." *Id*. at 4–5 ¶¶17–18. The Building Commission affirmed the orders to repair or demolish and vacate the three properties. *Id*. at 5 ¶18.

My-Way filed an action in state court seeking de novo review of the Building Commission orders. The Wayne County Circuit Court affirmed the Building Commission orders finding the evidence presented at the hearings, "clearly established that the [three properties] are unsafe to people and property; constitute a fire hazard; are a hazard to public health; constitute a nuisance; and are dangerous to people or property because of violations of statute and City Ordinance concerning building condition and maintenance." *Id*. at 8 ¶35.

In 2018, the City applied for and received a brownfield community assessment grant from the U.S. Environmental Protection Agency ("EPA") in the amount of $300,000.00 for investigating brownfields, including the 310/358 Properties (Filing No. 241 at 10).[2] On October 27, 2020, City Attorney Andrew Sickmann ("Sickmann") sent a letter to My-Way demanding they vacate the 310/358 Properties (Filing No. 238-6 at 2–3 ¶9). On March 2, 2021, Wayne County acquired the 310/358 Properties by way of tax sale (Filing No. 251 at 10). Then, on March 22, 2021, Wayne County transferred ownership of the 310/358 Properties to the City. *Id*. On June 16, 2021, My-Way responded to Sickmann's letter stating that My-Way was still attempting to comply with the Building Commission orders (Filing No. 238-6 at 3).

On July 9, 2021, Beth Fields, an employee of the City, accompanied two inspectors to perform a site reconnaissance of the 310/358 Properties to determine, among other things, if there were Recognized Environmental Conditions that might qualify the City as an innocent landowner pursuant to the Comprehensive Environmental Response, Compensation and Liability Act

---

[2] A brownfield is an abandoned, idled, or underused industrial and commercial facility/site where expansion of redevelopment is complicated by real or perceived environmental contamination. EPA's Brownfields initiative helps communities mitigate potential health risks and restore the economic viability of such areas or properties. *See* https://cimc.epa.gov/ords/cimc/f?p=121:19::::0:P0_GRANT_ID:69604954 (last accessed March 10, 2026).

("CERCLA") (Filing No. 251 at 11). However, the site reconnaissance was limited because access to the majority of the main site building was not possible due to the accumulation of plastic debris and storage. *Id*. Reconnaissance was also difficult because Smith kept the 310/358 Properties under lock and key and five million pounds of materials remained in the buildings (Filing No. 238-1 at 678–685, pp. 669:8–676:20).

The Final Technical Report of the site was completed on December 29, 2022, and submitted to the Environmental Protection Agency ("EPA") (Filing No. 251-10). The Final Technical Report found that Smith's company, My-Way Trading, had "created a hostile and potentially unsafe condition for site reconnaissance" and "the volume of plastics storage inside and outside of structures complicated reconnaissance conditions." *Id*. at 9.

On April 11, 2023, the industrial warehouse at the 358 Property—"containing large amounts of chipped, shredded, and recycled plastics"—caught fire. (Filing No. 251 at 11). A four-alarm catastrophic fire alarm was issued, involving the burning of ordinary combustibles, petroleum products, energized electrical materials, and combustible metals, (Filing No. 251-11 at 33, pp. 127:2–15), with the plastics waste and other refuse contributing to the fire. *Id*. at 42, pp. 165:14–21. While the cause of the fire may be disputed, Gardner determined the origin to be the exterior of the building at the 358 Property which spread to the 310 Property, the 308 Property. (Filing No. 251-5 at 6.) As a result of the fire, the Wayne County Emergency Management Agency issued an evacuation order of a half mile radius from the origin of the fire—the 358 Property—resulting in the evacuation of up to 2,000 individuals (Filing No. 251-5 at 5, pp. 18:19–19:8, Filing No. 251-3 at 18). The evacuation order remained in place for five days, ultimately being lifted on April 16, 2023. *Id*. at 6, pp. 24:12–23. The smoke from the fire caused air quality concerns in the area and significant disruption to the community. *Id*.

The debris from the fire contained asbestos, hydrogen cyanide, benzene, chlorine, and carbon monoxide in the evacuation zone (Filing No. 251-13). After people were allowed to return to their homes, they were directed to clean the interior of their homes, arrange for the EPA to clean the exterior of their properties as it may contain asbestos, and were not to mow their lawns or let their pets roam freely in their yard until this was completed (Filing No. 251 at 13). Plaintiffs own and reside in homes which were subject to evacuation as a result of the April 11, 2023, fire (Filing No. 72 at 4). Craig was injured when he fell off a ladder in late July 2023 cleaning his home's gutters and power washing his white house because of the "dark color" of the homes in the area (Filing No. 251-15 at 26).

Plaintiffs alleged damages include the following categories: (a) loss of use of land; (b) costs of housing during the fire; (c) lost wages; (d) medical costs for Craig only; (e) home repairs/cleaning; (f) groceries, meals, and other purchases required during the fire; (g) pet boarding; and (h) pain and suffering/emotional damages (Filing No. 238-10 at 124:23–125:5, 129:19–134:5) (Filing No. 238-11 at 36, 103, 121:6–130:14)

**B.      Procedural Background**

On April 19, 2023, Craig sent a tort claim notice to the City (Filing No. 128-1 at 6). On April 20, 2023, the Plaintiffs filed their original Complaint against Cornerstone (Filing No. 1). Stokes promptly sent a tort claim notice to the City (Filing No. 128-1 at 10). Plaintiffs filed an Amended Complaint adding claims against the City on July 17, 2023, and CTG filed a Third-Party Complaint against the City in state court (Filing No. 1-2 at 69). That action was removed to federal court on September 1, 2023 (Filing No. 1). The City filed a Crossclaim against My-Way on October 10, 2023 (Filing No. 18). Plaintiffs motion for leave to file a Second Amended Complaint (Filing No. 57), was granted on April 22, 2024 (Filing No. 70).

Plaintiffs filed a Second Amended Class Action Complaint the following day, April 23, 2024 (Filing No. 72). The Second Amended Class Action Complaint alleges that "Defendants' tortious conduct of failing to maintain the Industrial Facility and the hazardous contents therein set in motion a chain of events resulting in a widespread fire which released noxious fumes and hazardous materials including asbestos into the air and ground water of the surrounding area." *Id*. at 3. On September 13, 2024, Plaintiffs filed a Motion to Certify Class, (Filing No. 116), and the several Motions before the Court followed. Plaintiffs' Motion to Certify Class was granted on September 29, 2025 (Filing No. 287).

## II.      LEGAL STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).

In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of

material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs*, 335 F.3d 643, 647 (7th Cir. 2003). "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arb. Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

### III.    <u>DISCUSSION</u>

There are three separate pleadings before the Court: (1) Plaintiffs' Tushawn Craig and Marquetta Stokes Second Amended Class Action Complaint against Cornerstone Trading Group, Seth Smith and the City of Richmond, Indiana; (2) the City of Richmond's Cross Claims against Cornerstone Trading Group, Smith, and My-Way Trading; and (3) Cornerstone Trading Group's

Third-Party Complaint against the City of Richmond, Indiana. (Filing No. 72). The Court will discuss each in turn.

**A.      Plaintiffs' Second Amended Class Action Complaint**

Plaintiffs' Second Amended Class Action Complaint alleges the following Claims for Relief against Cornerstone, Smith, and the City: Count I: Strict Liability (for Ultra-Hazardous Activities); Count II: Negligence; Count III: Res Ipsa Loquitur; Count IV: Private Nuisance; Count V: Trespass; Count VI: Battery; and Count VII: Punitive Damages (*see* Filing No. 72). The City moves for summary judgment on all Plaintiffs' claims against it (Filing No. 237); and Cornerstone moves for partial summary judgment seeking judgment in its favor as to all claims asserted against Smith in his individual capacity (Filing No. 232).

**1.   The City's Motion as to Plaintiffs' Claims**

The City argues that they are entitled to summary judgment on all of Plaintiffs' claims for several reasons: (a) Plaintiffs' claims fail as a matter of law; (b) Plaintiffs failed to comply with the Indiana Tort Claims Act ("ITCA"); (c) Plaintiffs' claims are barred by the immunities provided in the ITCA; (d) Plaintiffs' contributory negligence bars their claims; and (e) certain damages theories fail as a matter of law (*see* Filing No. 241). The Plaintiffs respond to each of these arguments, respectively (*see* Filing No. 251). Accordingly, the Court will address each argument in that sequence as it relates to each count.

**a.   The Merits of Plaintiffs' Claims**

Neither party disputes that Indiana law applies, and the Court agrees. *See Miller v. Long-Airdox Co.*, 914 F.2d 976, 978 (7th Cir. 1990) ("Generally, in a tort case, the two most important contacts are the place where the injury occurred and the place where the conduct causing the injury occurred."); *see also Fetzer v. Wal-Mart Stores, Inc.*, No. 13 C 9312, 2016 U.S. Dist.

LEXIS , at *41 (N.D. Ill. 2016) (when injury and conduct alleged causing the injury occur in the same state, that state's law generally applies) (citation omitted).

### i.  Count I: Strict Liability

Plaintiffs' strict liability claim asserts that Defendants "ignored unsafe premises notices, knowingly allowed substantial fire hazards to exist on their premises, and engaged ultra-hazardous activities including the handling, storage, and maintenance of ultra-hazardous materials, including accelerants, toxic materials, and asbestos that create a risk of serious harm to persons or property" – which constitutes abnormally dangerous activities (Filing No. 72 at 10). Because of their abnormally dangerous activities, Plaintiffs argue the Defendants are strictly liable for any damages sustained by them and other Class members, whether to person or property. *Id*.

Tort law imposes "a duty of reasonable care under the circumstances . . . and some commercial activities are so dangerous that [Indiana courts] impose a harsher rule, holding defendants liable for damage they cause even when they *did* act reasonably under the circumstances." *Cave Quarries, Inc. v. Warex LLC*, 240 N.E.3d 681, 686–686 (Ind. 2024) (internal quotation marks and citation omitted) (emphasis in original). "That is, [Indiana courts] impose 'strict liability,' which 'assumes no negligence of the actor, but chooses to impose liability anyways.'" *Id*. at 686 (quoting *Cook v. Whitsell-Sherman*, 796 N.E.2d 271, 276 (Ind. 2003)).

The City points out that while Indiana recognizes the doctrine of strict liability stemming from abnormally dangerous activities, its imposition is rare and "it appears that strict liability for abnormally dangerous activities has been limited in Indiana to blasting and housing wild animals in a residential area." *Fechtman v. U.S. Steel Corp.*, 994 N.E.2d 12432, 1250 (Ind Ct. App. 2013)

(citing *Enos Coal Mining Co. v. Schuchart*, 188 N.E.2d 406, 410 (1963) (blasting); *Irvine v. Rare Feline Breeding Ctr., Inc.*, 685 N.E.2d 120, 124–25 (Ind. Ct. App. 1997) (wild animal)).

The City argues that Plaintiffs' claim of strict liability fails because, as defined in Indiana, it was not engaged in an abnormally dangerous activity (Filing No. 241 at 24). The City first argues there is no evidence that it conducted *any* activity at the 310/358 Properties, and it was merely the legal title owner of the 310/358 Properties. And the only action it performed during its ownership was a brownfield investigation. The City next provides examples of the high hurdle for this claim by pointing out that the Indiana Supreme Court "held that the storage of dynamite was not an abnormally dangerous activity subject to strict liability," and the Indiana Court of Appeals "held that the manufacture and storage of chlorine gas was not an abnormally dangerous activity." *Id*. (quoting *Fechtman*, 994 N.E.2d at 1250). The City posits that if storing dynamite and chlorine gas are not abnormally dangerous activities, storing plastics cannot be either.

In their Response, Plaintiffs argue that Indiana follows the Restatement (Second) of Torts § 519–520, which imposes strict liability when a party carries on an activity that is inherently dangerous even when reasonable care is used (Filing No. 251 at 19 (citing *Cave Quarries, Inc. v. Warex LLC*, 219 N.E.3d 221, 225 (Ind. Ct. App. 2023)). Plaintiffs add that Indiana courts have recognized that storage of large quantities of combustible or hazardous materials in densely populated urban areas, especially when done without adequate safeguards, can constitute an abnormally dangerous activity. *Id*. (citing *Bridges v. Kentucky Stone Co.*, 425 N.E.2d 125, 126–27 (Ind. 1981)). Plaintiffs conclude by asserting that courts evaluate six factors to determine whether an activity is abnormally dangerous including the degree of risk, inability to eliminate the risk with care, the activity's uncommonness, and its appropriateness to the place. *Id*.

11

Plaintiffs misapply the case law and overextend *Bridges*. Their contention that Indiana follows the Restatement is incorrect. Plaintiffs cite the Indiana Court of Appeals case, *Cave Quarries*, 219 N.E.3d 221, but that case was vacated by the Indiana Supreme Court. *See Cave Quarries*, 219 N.E.3d 681. In *Cave Quarries*, the Indiana Supreme Court explicitly disclaimed the use of the Restatement to determine whether blasting constituted an abnormally dangerous activity and instead followed the 150 years of Indiana case law holding that the activity of blasting is considered an abnormally dangerous activity. *Id*. at 686.

Plaintiffs overextend *Bridges* by contending that Indiana courts have recognized that storage of large quantities of "combustible or hazardous materials in densely populated urban areas, especially when done without adequate safeguards, can constitute an abnormally dangerous activity." (Filing No. 251 at 19 (citing *Bridges*, 425 N.E.2d at 127)). That is not what *Bridges* says. Rather, *Bridges* explicitly rejects a *per se* rule of liability that storing dynamite is ultra hazardous. 425 N.E.2d at 126. In *Bridges*, the Indiana Supreme Court held that whether the storage of *dynamite* in any particular circumstance is an ultra-hazardous activity must be determined on a case-by-case basis. *Id*. Plaintiffs appear to subvert the language in *Bridges* substituting the word "dynamite" with the phrase "combustible or hazardous materials." This is an overextension.

As the City points out, were the storing of "combustible materials" to be deemed an ultra-hazardous activity, every lumber yard would be strictly liable solely on the basis of storing wood. Such a construction is unreasonable and goes against the case law. *See City of Bloomington, Ind. V. Westinghouse Elec. Corp.*, 891 F.2d 611, 616 (7th Cir. 1989) (quoting *Erbrich Products Co. v. Wills*, 509 N.E.2d 850, 856 (Ind. Ct. App. 1986) ("If the rule were otherwise, virtually any commercial or industrial activity involving substances which are dangerous only in the abstract

automatically would be deemed as abnormally dangerous. This result would be intolerable."); *see also Consol. Rail Corp. v. Allied Corp.*, 882 F.2d 254, 257 n.3 (7th Cir. 1989) ("Indiana courts have generally been reluctant to impose strict liability based on the abnormally dangerous activity doctrine.").

Moreover, the Court could not find, and the Plaintiffs did not cite, any authority indicating that the storage of plastic can constitute an abnormally dangerous activity such that strict liability should be imposed. Accordingly, summary judgment is **granted** as to the strict liability claim in Count I.

### ii.  Count II: Negligence

To recover on their negligence claims, Plaintiffs must prove: (1) the City owed them a duty; (2) the City breached that duty through conduct that fell below the appropriate level of care; and (3) the City's breach caused injury to the Plaintiffs. *Cave Quarries*, 240 N.E.3d at 685. The City argues that Plaintiff's claim in Count II: Negligence, fails on all three elements (Filing No. 241 at 25).

### a.  Duty

The question of whether a duty exists is a question of law for the Court to decide. *Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 389 (Ind. 2016). Absent a duty, there can be no negligence. *Peters v. Forster*, 804 N.E.2d 736, 738 (Ind. 2004). Governmental entities are also "bound by the same duty of care as a non-governmental unit except where the duty alleged to have been breached is so closely akin to one of the limited exceptions (prevent crime, appoint competent officials, or make correct judicial decisions) that it should be treated as one as well." *Benton v. City of Oakland City*, 721 N.E.2d 224, 230 (Ind. 1999); *see Putnam County Sheriff v. Price*, 954 N.E.2d 451, 454 (Ind. 2011) ("[A]ll governmental units are bound, both directly and

13

under the theory of respondeat superior, by the common law duty to use ordinary and reasonable care under the circumstances except for a few exceptions not applicable here.") (quoting *Benton*, 721 N.E.2d at 232–233)).

Indiana recognizes the *Webb* general duty formulation, which examines and balances: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Cox v. Stoughton Trailers, Inc.*, 837 N.E.2d 1075, 1079 (Ind. Ct. App. 2005) (citing *Webb v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991), *overruled on other grounds*); *see also St. John Tow Bd. v. Lambert*, 725 N.E.2d 507, 514 (Ind. Ct. App. 2000) (stating the same three factors to determine whether a duty exists). "The *Webb* test, however, is inapplicable in cases where the element of duty has already been declared or otherwise articulated under a different test." *Id*. (citing *Northern Indiana Public Service Co. v. Sharp*, 790 N.E.2d 462, 465 (Ind. 2003)). "For example, there is no need to apply *Webb* to determine what duty a business owner owes to its invitees. The law in this area is well settled[.]" *Sharp*, 790 N.E.2d at 465.

The parties put forth arguments under both the *Webb* standard and under premises liability principles. However, premises liability principles are inapplicable here as premises liability arises from a duty to maintain property in a reasonable safe condition for business invitees. *See Podemski v. Praxair, Inc.*, 87 N.E.3d 540, 547 (Ind. Ct. App. 2017) ("a property owner must maintain its property in a reasonably safe condition for business invitees, including employees of independent contractors."). "Indiana has adopted the formulation of landowners' liability to business invitees expressed in the Restatement (Second) of Torts." *Id*. The Restatement provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he:
>> (a) Knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

14

(b) Should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) Fails to exercise reasonable care to protect them against the danger.

*Id.* (quoting Restatement (Second) of Torts § 343). Moreover, the Indiana Supreme Court in

*Rogers v. Martin*, held that,

> while section 343 limits the scope of the landowner—invitee duty in cases involving injuries due to *conditions* of the land, injuries could also befall invitees due to *activities on* a landowner's premises unrelated to the premises' condition—and that landowners owe their invitees the general duty of reasonable care under those circumstances, too.

63 N.E.3d 316, 323 (Ind. 2016).

The Plaintiffs in the case were not invitees. There is no evidence that any of the Plaintiffs ever went onto the 308 Property or the 310/358 Properties in any capacity. Rather, the alleged damages occurred away from the properties as a direct result of the fire. Accordingly, the Court finds that the *Webb* factors control although premises liability cases will be relevant to the final *Webb* factor discussed below.

Turning to the first factor—the relationship between the parties—the City argues that the only relationship between the City and the Plaintiffs is that they are members of the general public (Filing No. 241 at 27). The Court agrees. There is no special relationship between the City and the Plaintiffs beyond that of neighbors.

Concerning the second factor, foreseeability, "[t]he requirement of foreseeability is different and less demanding in the context of the *Webb* duty analysis than it is in the context of determining proximate cause." *Cox*, 837 N.E.2d at 1080 (citing *Hammock v. Red Gold, Inc.*, 784 N.E.2d 495, 499–500 (Ind. Ct. App. 2003)). "Foreseeability for the purposes of duty involves a general and broad analysis of the plaintiff and the harm involved without regard to the facts of the occurrence." *Id.* (quoting *Red Gold*, 784 N.E.2d at 500). The City argues the Plaintiffs'

15

damages such as ash and soot on their property, dislocation damages, and injuries sustained while cleaning gutters, is not "the kind normally expected." (Filing No. 241 at 27).

The Plaintiffs respond persuasively by arguing that the threat of a fire and the potential consequences to these residents was not only foreseeable but had been extensively forewarned (Filing No. 251 at 24). In *Cox*, the Indiana Court of Appeals determined the foreseeability of a duty for a defendant who had leased a car trailer to a third party. 837 N.E.2d 1075. Specifically, the third party was $22,000.00 in arrears on its lease, and defendant—Stoughton Trailers—had a right to possession of the trailer. *Id*. at 1078. Stoughton Trailers agreed with the third party that the trailer would be resold to another entity, but in the meantime, the third party could keep the trailer. *Id*. Stoughton Trailers then arranged to sell the trailer but before they could do so, while the trailer was still in the third-party's possession, a wheel came off on the highway and struck a vehicle causing death. *Id*. Cox, the decedent's estate, sued Stoughton Trailers arguing that they had negligently failed to maintain and adequately inspect the trailer which caused the death. When analyzing the foreseeability factor under the *Webb* test, the Court of Appeals determined there were two levels of foreseeability: first, that the third party would not maintain the trailer, and second, that such failure could result in an accident. *Id*. at 1081. The Indiana Court of Appeals found that the evidence weighed against foreseeability because Stoughton Trailers had no knowledge of a failure to maintain the trailer by the third party. *Id*.

Here, however, there is not only evidence that My-Way failed to maintain the 310/358 Properties, but direct evidence that My-Way's longstanding failure to do so constituting a fire hazard was known to the City. For example, the Wayne County Circuit Court, in its Order Affirming the Building Commission orders specifically foresaw the following,

> The evidence presented at the Unsafe Building Hearings, which is now a part of the record in this cause, clearly established that the structures in which [My-Way] ha[s]

an interest are unsafe to people and property; constitute a fire hazard; are a hazard to public health; constitute a nuisance; and are dangerous to people or property because of violations of statute and City Ordinance concerning building condition and maintenance.

(Filing No. 251-6 at 8 ¶35). Thus, it was foreseeable that Plaintiffs' damages were likely to occur as the Order specifically stated that the hearings "addressed possibilities associated with a fire event at the unsafe properties which includes a multi-agency possibility involving resources of the health department, emergency management, and local departments outside of the City[,]" and that the National Oceanic and Atmospheric Administration conducted "an 'air plume study' relative to the unsafe properties, which reflect[s] the density of particles in the air in the event that a fire was to occur, which caused concerns for possible evacuations of the area." *Id*. at 7 ¶34. The designated evidence shows that the City had actual knowledge of both a failure to maintain the 310/358 Properties on the part of My-Way and the possibility of Plaintiffs' damages of ash and soot on their properties and dislocation damages. Accordingly, the foreseeability factor weighs in favor of a duty.

The last factor is public policy. The Indiana Court of Appeals "has indicated that this *Webb* factor analyzes 'who is, or should be, in the best position to prevent [an] injury and how society should allocate the costs of such injury.'" *Cox*, 837 N.E.2d at 1081 (quoting *Red Gold*, 784 N.E.2d at 503). The court in *Cox* looked to cases concerning premises liability and other areas not applicable here. The court found these cases relevant because "they reflect public policy choices regarding who was in the best position to prevent injury in fact situations that are similar, but perhaps not identical, to this case." *Id*. Accordingly, this Court looks to premises liability cases to guide its inquiry on this factor.

17

The Court must first determine whether the Plaintiffs' injuries occurred because of a condition or activity on the 310/358 Properties. Indiana caselaw differentiates between the two critical inquiries in determining whether a landowner's duty of reasonable care extends to the circumstances at issue. If the claims arise from an activity, foreseeability is the critical inquiry; but if the claims arise from a condition, control of the premises is the critical inquiry. *See Rogers*, 63 N.E.3d at 324 ("[Indiana Supreme Court] case law has established that foreseeability becomes the determinative question as to whether a court will extend the landowner—invitee "duty to protect" to a situation that does not involve a condition of the land."); *cf Rhodes v. Wright*, 805 N.E.2d 382, 385 (Ind. 2004) ("In premises liability cases, whether a duty is owed depends primarily upon whether the defendant was in control of the premises when the accident occurred. The rationale is to subject to liability the person who could have known of any dangers on the land and therefore could have acted to prevent any foreseeable harm.").

"To distinguish between condition claims and activity claims, [Indiana courts] focus on the substance of the claims as reflected in the complaint, summary-judgment briefs, and designated evidence." *Pennington v. Mem'l Hosp. of South Bend, Inc.*, 223 N.E.3d 1086 (Ind. 2024). In *Pennington*, the plaintiff sued the owner of a fitness center for negligence following injuries sustained while swimming in the fitness center's pool. *Id*. at 1092. The plaintiff struck her head on a winged wall of the swimming pool while swimming backstroke. *Id*. To determine whether the fitness center's alleged duty to protect was based on a condition of the premises by having a winged wall or by the activity of swimming backstroke, the Indiana Supreme Court looked to the complaint, summary-judgment briefs, and designated evidence. Specifically, the plaintiff's complaint alleged that the fitness center did not "remedy dangerous conditions" and mentioned "safety features such as floating lines and adequate padding," while her summary

18

judgment brief argued that the fitness center "owed a duty of care to protect a member of its fitness club from an injury resulting from an exposed wall during normal use of its lap pool." *Id*. at 1098. The Indiana Supreme Court concluded that "[t]he unreasonable danger" in plaintiff's negligence claim was "swimming backstroke **next to the unpadded wing-wall**," stating, "[i]t was the placement and condition of this wing-wall that formed the basis for alleging a duty to protect." *Id*. (emphasis in original).

Here, the designated evidence shows that Plaintiffs' injuries occurred because of an activity upon the 310/358 Properties. Count II: Negligence specifically states,

> Defendants owe a duty of reasonable care while engaging in ultra-hazardous activities including the handling, storage, and maintenance of ultra-hazardous materials used in their operations, to keep their premises free of substantial fire hazards, and to maintain their property in a safe manner while adhering to all safety rules and regulations and complying with all unsafe building notices.

(Filing No. 72 at 11 ¶40). The designated evidence indicates that it was the accumulation of the plastics and materials from My-Way's business operations that form the basis of Plaintiffs' claims (*see* Filing No. 251-6 at 7 ¶32) ("The Commission has determined that the sheer volume of materials on the unsafe properties constitutes a fire hazard").

While the 310/358 Properties themselves were considered unsafe, the thrust of Plaintiffs' claims are based on the large amounts of plastics—approximately five million pounds at the time of the fire—which were being stored and handled there. Plaintiffs' Second Amended Class Action Complaint specifically includes allegations that the City engaged in ultra-hazardous *activities* on the premises. Accordingly, the Court finds that Plaintiffs' claims are based on an activity on the premises and that foreseeability would be the determinative question were this case to be based on premises liability to invitees.

As discussed above, Plaintiffs' damages were foreseeable, therefore, the Court is persuaded that the final *Webb* factor—public policy—weighs in favor of imposing a duty on the City. There is no special relationship between the parties beyond being neighbors, and the City had actual knowledge of the foreseeability of My-Way's negligence and the foreseeability of Plaintiffs' injuries. In addition, the Indiana Court of Appeals in *Cox* indicated that a duty "might obtain if the property owner has some actual knowledge of the dangerousness of the property or the third party's propensity to act negligently." 837 N.E.2d at 104. Here, the City had actual knowledge of both. Finally, the Plaintiffs' claims arise from activities conducted on the premises and thus, Indiana's premises liability cases indicate that foreseeability is the preeminent test to determine whether a duty should be imposed. Because of this, the final factor of the *Webb* test— public policy—also weighs in favor of a duty. Accordingly, the City owed a duty to the Plaintiffs to protect them from the harm caused by the fire.

### b. Breach

"Whether a particular act or omission is a breach of duty is generally a question of fact for the jury." *Sharp*, 790 N.E.2d at 466 (citing *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind. 1992)). However, "[i]t can be a question of law where the facts are undisputed and only a single inference can be drawn from those facts." *Id*.

The City argues that it could not have breached its duty because it was not in possession or control of the 310/358 Properties and therefore is entitled to summary judgment. The City contends that the evidence establishes that it acted reasonably in its investigations of these brownfields (Filing No. 241 at 28). However, the reasonableness of the City's investigations is not at issue. Rather, it is their alleged allowance and failure to remedy the known fire hazards on their property which led to Plaintiffs' injuries.

20

Moreover, the question of whether the City breached its duty by allegedly engaging in ultra-hazardous activities and failing to remedy the fire hazards is best suited for a jury. The facts are neither undisputed, nor lead to only a single inference. A reasonable jury could conclude that the City breached their duty to remedy the fire hazard by demanding only once that My-Way vacate the premises but failed to do anything beyond that. A reasonable jury could also conclude that the City's demand letter was sufficient action, and they did not breach their duty. Accordingly, the Court cannot conclude that as a matter of law, the City did not breach their duty.

### c.  **Proximate Cause**

The Indiana Supreme Court has explained the proximate cause standard under Indiana law:

> Proximate cause in Indiana negligence law has two aspects. The first—causation in fact—is a factual inquiry for the jury. If the injury would not have occurred without the defendant's negligent act or omission, there is causation in fact. A second component of proximate cause is the scope of liability. That issue, which is also for the trier of fact, turns largely on whether the injury "is a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated.

*City of Gary v. Smith & Wesson*, 801 N.E.2d 1222, 1243–1244 (Ind. 2003) (internal citations omitted).

The City argues that Plaintiffs have failed to offer evidence that the City's failure to maintain the 310/358 Properties or to correct the fire and safety issues actually caused the fire (Filing No. 241 at 29). The City adds that the origin and cause of the fire are beyond the knowledge of the average layperson and requires expert testimony and thus, because Plaintiffs have offered no expert testimony on the cause of the fire, they cannot prove that the City's actions were the proximate cause. *Id.* (citing *Gopalratnam v. Hewlett-Packard Co.*, No. 13-cv-618, 2017 U.S. Dist. LEXIS 40386, at *10 (E.D. Wis. March 21, 2017)).

Plaintiffs contend that there is sufficient evidence for the trier of fact to conclude that the City's failure to maintain and remove combustible plastic waste from the 310/358 Properties was the cause of the Plaintiffs' injuries (Filing No. 251 at 27). The Plaintiffs argue that the City knew of the vast amounts of combustible waste, were repeatedly warned by fire inspectors that the combustible waste posed an acute fire risk to the surrounding community, that the 310/358 Properties had deficient fire suppression thus posing a special fire hazard related to a potential fire's spread, and that the City knew of concern about fire spread and possible evacuation risks because of the air plume study conducted by the Wayne County Emergency Management Agency. The Court agrees.

The City's contention that Plaintiffs must provide expert testimony on the specific cause of the fire is incorrect. In *Gopalratnam*, the Eastern District of Wisconsin required the plaintiffs to provide expert testimony because their claims revolved around a laptop catching fire specifically due to the battery pack contained within. 2017 U.S. Dist. LEXIS 40386, at *10. There, expert testimony was needed because "[t]he inner workings of a laptop and its components, including the battery pack and its cells, are highly technical, beyond the understanding of lay persons, and, therefore, within the competence of experts." *Id*. Here, however, the issue is whether the City's alleged failure to maintain or remove the vast amounts of combustible plastics caused Plaintiffs' injuries.

The City focuses solely on the specific cause of the *start* of the fire. However, the Plaintiffs allege that the City's negligence caused their injuries, not that the City's negligence was the specific starting cause of the fire. In other words, just because the City's alleged negligence did not cause the specific combustion which started the fire, does not mean the City's alleged negligence could not have exacerbated the fire to the size and scale in this case ultimately leading

to the Plaintiffs' injuries. For example, if a fire begins in an empty warehouse equipped with fire suppression, it will likely burn out without harm to others regardless of the original cause. However, if a fire begins in a warehouse full of plastic and other combustible materials piled together without fire suppression, the result in this case likely occurs leading to the Plaintiffs' alleged injuries regardless of how the fire originally began. Said differently, it is the alleged negligent failure to maintain fire suppression and negligent allowance of a large number of combustible materials piled up against each other which the Plaintiffs complain of, not that the City accidentally started the fire.

Accordingly, the Court finds that a reasonable jury could conclude that the City's alleged negligence was the cause in fact of Plaintiffs' injuries. Indeed, Timothy Brown, the City's highest ranking Fire Chief at the time of the fire, specifically testified that the combustible plastics on the grounds contributed to the fire (Filing No. 251-11 at 42, pp. 165:14–21).

Moreover, while the foreseeability test for proximate cause is more demanding than the foreseeability test for duty, *Goodwin*, 62 N.E.3d at 390, there is sufficient evidence for a reasonable jury to conclude that the Plaintiffs' injuries due to the City's alleged failures were "a natural and probable consequence, which in the light of the circumstances, should have been foreseen or anticipated." *City of Gary*, 801 N.E.2d at 1244. As discussed above, the City was warned on numerous occasions that the vast number of combustible materials constituted a fire hazard. In addition, the Wayne County Circuit Court's order affirming the Building Commission orders specifically explained that the air plume study conducted by the Wayne County Emergency Management Agency found "concerns for possible evacuations of the area." (Filing No. 251-6 at 7 ¶34). Such dislocation damages due to evacuation are precisely what Plaintiffs seek, though the

City is correct that Craig's damages for falling off his ladder are unforeseeable and thus, not recoverable.

In conclusion, because the Court finds that the City owed Plaintiffs a duty to protect them from the foreseeable harm of damages due to the vast fire and a reasonable jury could conclude that the City's failure to do so was the proximate cause of Plaintiffs' injuries, a material question of fact remains as to proximate cause. Accordingly, the City's summary judgment motion is **granted in part and denied in part** as to Count II: Negligence. Summary judgment is **granted** as to Craig's injuries from falling off his ladder as these damages are not foreseeable. However, the Motion is **denied** as to other damages.

### iii. <u>Count III: Res Ipsa Loquitur</u>

"The doctrine of *res ipsa loquitur* recognizes that in some situations an occurrence is so unusual, that absent reasonable justification, the person in control of the situation should be held responsible." *Griffin v. Menard, Inc.* 175 N.E.3d 811, 815 (Ind. 2021). In Indiana, "[t]o establish this inference of negligence, a plaintiff must demonstrate: (1) that the injuring instrumentality was within the exclusive management and control of the defendant, and (2) the accident is of the type that ordinarily does not happen if those who have management or control exercise proper care." *Id*.

This claim fails for two reasons. First, "the doctrine [of *res ipsa loquitur*] still applies as an evidentiary tool, rather than a separate cause of action, allowing the inference of a defendant's negligent conduct under certain circumstances." *Isgrig v. Trs. Of Ind. Univ.*, 256 N.E.3d 1238, 1256 (Ind. 2025). Accordingly, Plaintiffs' *res ipsa loquitur* arguments are better suited as a component of their negligence claims instead of as a separate cause of action.

Second, even if the doctrine of *res ipsa loquitur* was a separate cause of action, it fails on the first element as applied to the City. The Plaintiffs' assert that the accumulation of combustible plastic materials was maintained on property owned by the City for two years and that this satisfies the exclusive control element (Filing No. 251 at 29). The Court is not persuaded.

In *Menard*, the Indiana Supreme Court held that a plaintiff could not succeed on his invocation of the doctrine of *res ipsa loquitur* when he pulled a sink off the shelf at his local Menard store and the bottom of the package broke open due to a loose staple causing the sink inside to fall on top of the plaintiff leading to injury. 175 N.E.3d at 812. The Indiana Supreme Court held that exclusive management and control by Menard "just isn't the case here because customers had access to the sink box." *Id*. at 815. Here, Plaintiffs' invocation of *res ipsa loquitur* cannot succeed because the City did not have exclusive control and management of the injuring instrumentality. My-Way kept the 310/358 Properties under lock and key. Moreover, the injuring instrumentality occurred due to My-Way's plastics business. Accordingly, summary judgment motion is **granted** for Count III: Res Ipsa Loquitur.

### iv. <u>Count IV: Private Nuisance</u>

Indiana Code Section 32-30-6-6—Indiana's nuisance statute—defines an actionable nuisance as: "Whatever is (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property[.]" "A public nuisance is that which affects an entire neighborhood or community while a private nuisance affects only one individual or a determinate number of people." *Novogroder Cos. v. Massaro*, 997 N.E.2d 1173, 1177 (Ind. Ct. App. 2013). "A private nuisance arises when it has been demonstrated that one party has used his property to the detriment of the use and enjoyment of another's property." *Id*.

25

Moreover,

> A nuisance may be a nuisance per se, something which cannot be lawfully conducted or maintained (such as a house of prostitution or an obstruction encroaching upon a public highway) or may be a nuisance per accidens, where an otherwise lawful use may become a nuisance by virtue of the circumstances surrounding the use. Whether something is a nuisance per se is a question of law, and whether something is a nuisance per accidens is a question for the trier of fact.

*Id*. (internal citations omitted).

The City argues that Plaintiffs do not have evidence that it engaged in any activity constituting a nuisance (Filing No. 241 at 31). The City asserts that the only activity it performed was communicating with My-Way about removing the plastics located on the 310/358 Properties. Plaintiffs respond that the City's prolonged failure to remediate the dangerous conditions on its property despite years of warnings, inspection reports, and documented fire concerns amounts to the maintenance of a nuisance (Filing No. 251 at 30). For over two years, the City owned the 310/358 Properties and allowed combustible materials in tremendous volume to remain without fire suppression and limited access to egress and fire lanes. The Plaintiffs add that the result of such allowances was an uncontrolled fire and its toxic plume which unquestionably interfered with Plaintiffs' ability to reside safely in their homes. The Court agrees.

Here, the Plaintiffs allege a legal use of premises which affected a finite number of people; thus, they alleged a private, per accidens nuisance. *See Massaro*, 997 N.E.2d at 1177. "[T]he relevant inquiry is whether the thing complained of produces such a condition as in the judgment of reasonable persons is naturally productive of actual physical discomfort to persons of ordinary sensibility, tastes, and habits." *Id*. (quoting *Wendt v. Kerkhof*, 594 N.E.2d 795, 797 (Ind. Ct. App. 1992)). The Court finds that this is a question for the trier of fact because a reasonable jury could conclude that the City's failure to remedy a known fire hazard for more than two years resulting

in a large-scale fire dislocating Plaintiffs from their homes could constitute a private nuisance. Accordingly, summary judgment motion is **denied** as to Count IV: Private Nuisance.

### v. **Count V: Trespass**

Plaintiffs' argue the City was a trespasser as it owned and controlled the 310 and 358 Properties, which were known to be filled with combustible plastic bales and debris, and despite being warned repeatedly by its own officials that these materials posed a fire risk, the City took no meaningful steps to remove or secure them. (Filing No. 251 at 31). A plaintiff claiming civil trespass must demonstrate: (1) possession of the land when the trespass occurred; and (2) that the defendant entered the land without a legal right to do so. *KB Home Ind., Inc. v. Rockville TBD Corp.*, 928 N.E.2d 297, 308 (Ind. Ct. App. 2010). The Indiana Court of Appeals has consistently held that to be responsible for a trespass a defendant must have committed an intentional act:

> A trespasser cannot be held liable unless a voluntary act caused his entry onto the plaintiff's property . . . . Although it is not necessary that the trespasser intend to commit a trespass or even that he know that his act will constitute a trespass, it is required for the trespass that there be an intentional act and an intent to do the very act which results in the trespass.

*Neal v. Cure*, 937 N.E.2d 1227, 1236 (Ind. Ct. App. 2010) (cleaned up).

The City argues that Plaintiffs' claims fail because there is no evidence of an "intentional act," but rather the Plaintiffs allege that the City failed to act (Filing No. 241 at 32). Plaintiffs respond that the City misconstrues the law arguing that trespass includes,

> One who recklessly or negligently, or as a result of an abnormally dangerous activity, enters land in the possession of another or causes a thing or third person so to enter is subject to liability to the possessor if, but only if, his presence or the presence of the thing or the third person upon the land causes harm to the land, to the possessor, or a thing or a third person in whose security the possessor has a legally protected interest.

([Filing No. 251 at 31](#) (quoting *B&B, LLC v. Lake Erie Land Co.*, 943 N.E.2d 917, 927 (Ind. Ct. App. 2011)). Plaintiffs argue that noxious material can constitute trespass if "there was a direct causal relation between the actor's conduct and the intrusion of the foreign matter upon the possessor's land that caused the harm." *Id.* (quoting *Lake Erie Land Co.*, 943 N.E.2d at 927).

It is undisputed that noxious materials entered Plaintiffs' land because of the fire. However, Plaintiffs do not allege an intentional act; rather, they allege the City failed to act. Plaintiffs are correct that noxious material may constitute trespass in certain situations, but the act which resulted in the noxious material entering their land must have been intentional. *Cure*, 937 N.E.2d at 1236. When earlier discussing the element of proximate cause, the Court found that a reasonable jury could conclude there was a causal link between the City's conduct and the Plaintiffs' resulting injury, but that link was predicated on the City's failure to act. The difference is that one may be liable in negligence by failing to act, whereas liability for trespass is predicated upon an intentional act.

Here, no reasonable jury could conclude that the City acted intentionally for the purpose of trespass. Plaintiffs allege that the City failed to properly maintain their property and failed to remove the combustible plastics from their property. But the evidence indicates that the City did not perform any act concerning the 310/358 Properties beyond reconnaissance. Such acts do not amount to an intentional act for the purposes of trespass. Accordingly, summary judgment is **granted** as to Count V: Trespass.

### vi. <u>Count VI: Battery</u>

Plaintiffs allege the "noxious fumes, toxic materials, other chemicals, and debris including asbestos which were spread as a result of the fire at Defendants' facility constituted harmful and/or offensive contact with the property of Plaintiffs and other Class Members" supports their

claim for battery. (Filing No. 72 at 13). In Indiana, a party is liable for battery if "(a) he acts intending to cause a harmful or offensive contact with the person of the other or third person, or an imminent apprehension of such contact, and (b) a harmful contact with the person of the other directly or indirectly results." *Sing v. Lyday*, 889 N.E.2d 342, 360 (Ind. Ct. App. 2008) (quoting *Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007). "A touching, however slight, may constitute an assault and battery." *Id.* (quoting *Knight v. Ind. Ins. Co.*, 871 N.E.2d 357, 362 (Ind. Ct. App. 2007)).

As with trespass, the City contends that it did not commit battery because it did not intentionally cause the noxious materials to enter the Plaintiffs' properties (Filing No. 241 at 33). The Plaintiffs argue that battery does not require knowledge of specific consequences that would result (Filing No. 251 at 33 (citing *Dowls v. State*, 2023 Ind. App. Unpub. LEXIS 928, at *5–6 (Ind. Ct. App. 2023)). The Plaintiffs respond that intent exists, because the City knew of the fire hazard and failed to remedy the situation. The Court disagrees.

The Indiana Court of Appeals has stated many times, quoting Dean Prosser, regarding the concept of intent in tort law:

> The mere knowledge and appreciation of a risk, short of substantial certainty, is not the equivalent of intent. The defendant who acts in the belief of [sic] consciousness that he is causing an appreciable risk of harm to another may be negligent, and if the risk is great his conduct may be characterized as reckless or wanton, but is not classified as an intentional wrong. In such cases the distinction between intent and negligence obviously is a matter of degree. Apparently the line has been drawn by the courts at the point where the known danger ceases to be only a foreseeable risk which a reasonable man would avoid, and becomes a certainty.

*Shewmaker v. Etter*, 693 N.E.2d 608, 611 (Ind. Ct. App. 1998) (citing *Cox v. American Aggregates Corp.*, 580 N.E.2d 679, 684 (Ind. Ct. App. 1991) (same); *National Can Corp. v. Jovanovich*, 503

N.E.2d 1224, 1233 (Ind. Ct. App. 1987) (same); *Blade v. Anaconda Aluminum Co.*, 452 N.E.2d 1036, 1038 (Ind. Ct. App. 1983) (same)).

As explained by the Indiana Court of Appeals, mere knowledge on the City's part that a fire could occur and deposit noxious materials onto Plaintiffs' properties is not the same as intentionally causing such occurrence. Accordingly, summary judgment motion is **granted** as to Count VI: Battery.

### b.  Compliance with the Indiana Tort Claims Act ("ITCA")

The City argues that even if they are not entitled to summary judgment on the merits of Plaintiffs' claims, they are entitled to summary judgment because the Plaintiffs failed to comply with the ITCA (Filing No. 241 at 33). The ITCA requires a party filing a claim against a political subdivision to file notice with the governing body of that political subdivision within one hundred eighty (180) days after the loss occurs. *See* Ind. Code § 34-13-3-8. The notice must,

> [D]escribe in a short and plain statement the facts on which the claim is based. The statement must include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of the damages sought, and the residence of the person making the claim at the time of the loss and at the time of filing the notice.

Ind. Code § 34-13-3-10. The notice must also be in writing and delivered in person or by registered or certified mail. Ind. Code § 34-13-3-12.

The City asserts two arguments in support of their contentions: (1) Plaintiffs failed to sufficiently describe their claims against the City, and (2) Plaintiffs provided no notice of class claims.

"Once a defendant raises an issue of noncompliance [with the ITCA], the burden shifts to the plaintiff to prove compliance." *Gibson v. Carrington*, No. 1:20-cv-02812, 2021 U.S. Dist. LEXIS 81287, at *2 (S.D. Ind. Apr. 27, 2021) (citing *Brown v. Alexander*, 876 N.E.2d 376, 384

(Ind. Ct. App. 2007)). The ITCA requires "a two-step process—the filing of a claim and, if denied, the filing of a lawsuit," and courts are to bar lawsuits unless "the person's claim has been denied in whole or part." *Brown*, 876 N.E.2d at 385 n.4 (citing Ind. Code § 34-13-3-13).

The City contends the Plaintiffs' notice failed to describe the facts required under Ind. Code § 34-13-3-10 (Filing No. 241 at 35). Specifically, the Plaintiffs' notice did not to provide the names of anyone involved with the loss other than their own, asserted categories of damages but did not state any amount sought, and failed to list the Plaintiffs' residences. Plaintiffs respond that they substantially complied with the ITCA because their notice was timely and contained written statements identifying the claimants, the date and location of the loss, and the nature of the injuries and damages sustained (Filing No. 251 at 34). Plaintiffs point out that they provided notice of the class claims on October 6, 2023, which was within the 180-day period.

Indiana courts have held that "a liberal application of the requirements of the ITCA notice statute is proper in order to avoid denying plaintiffs an opportunity to bring a claim where the purpose of the statute has been satisfied. *Town of Knightstown v. Wainscott*, 70 N.E.3d 450, 456 (Ind. Ct. App. 2017) (citing *Brown*, 876 N.E.2d at 381). "The notice requirement is intended to ensure that government entities have the opportunity to investigate the incident giving rise to the claim and prepare a defense." *Id*. (internal quotation marks and citations omitted). "Like any statute in derogation of the common law, the ITCA must be strictly construed against limitations on the claimant's right to bring suit." *Schoettmer v. Wright*, 992 N.E.2d 702, 706 (Ind. 2013) (internal quotation marks and citations omitted). "[S]o long as its essential purpose has been satisfied, it should not function as 'a trap for the unwary.'" *Id*. (quoting *Galbreath v. City of Indianapolis*, 255 N.E.2d 225, 229 (1970)). "The question of compliance is not a question of fact

31

for the jury but ultimately a legal determination to be made by the court." *Indiana State Highway Comm'n v. Morris*, 528 N.E.2d 468, 471 (Ind. 1988).

Further, "not all technical violations of [the ITCA] are fatal to a claim." *Brown*, 876 N.E.2d at 381. "Non-compliance has been excused in certain cases based on the theories of substantial compliance, waiver, and estoppel." *Id*. "In general, a notice that is filed within the 180-day period, informs the municipality of the claimant's intent to make a claim and contains sufficient information which reasonably affords the municipality an opportunity to promptly investigate the claim satisfies the purpose of the statute and will be held to substantially comply with it." *Collier v. Prater*, 544 N.E.2d 497, 499 (Ind. 1989) (cleaned up). "However, where a plaintiff, within the 180-day period, fails to file any notice of an intent to make a claim, actual knowledge of the occurrence on the part of the city, even when coupled with an investigation of the occurrence, will not suffice to prove substantial compliance." *Id*. (cleaned up).

Here, Plaintiffs substantially complied with the notice requirements of the ITCA. Sickmann's affidavit states that he received 146 tort claims notices related to the fire, 116 of which were from individuals and business with addresses within a half-mile radius of the 310/358 Properties while he was working as the City's attorney (Filing No. 128-1 at 3 ¶¶6–7). The 116 individual tort claims notices are also attached to his affidavit with dates ranging from April 19, 2023, to October 4, 2023, all within the 180-day time frame from the date of loss.[3] *Id*. at 6–279. Moreover, each of the individual notices explains who was injured, the categories of injuries they suffered, the alleged cause of the injuries, the purpose of the letter in an attempt to conform to the ITCA, and explicitly states, "[i]f for any reason the above [n]otice does not constitute full and complete notice of our claim pursuant to the [ITCA], or that some other agency or department

---

[3] October 8, 2023, is 180 days after April 11, 2023—the date of the fire.

should also be notified," Plaintiffs' counsel should be contacted immediately and would provide any additional information necessary. *Id*. These notices substantially comply with the ITCA.

The City's argument concerning the Plaintiffs' failure to provide notice of class action claims is unpersuasive. The Plaintiffs submitted the exact same notice as the individual notices and asserted class claims and their intention to pursue a class certification (Filing No. 251-22). This notice was dated October 6, 2023, which is within the 180-day time frame. The City's contention that "[t]he tort claims notices provide no indication that a class action against the City will be pursued," is without merit as the class action tort claims notice specifically states, "The putative class representatives in this matter will be seeking class certification on behalf of all individuals similarly situated. The purpose of this correspondence is to provide notice of these class claims on behalf of every potential class member." *Id*. at 1. Because Plaintiffs timely provided both individual tort claims notices and class claims notice and both substantially comply with the ITCA, Plaintiffs' claims are not barred by the notice requirements of the ITCA.

### c.   **Immunities of the Indiana Tort Claims Act ("ITCA")**

The ITCA also provides immunity for governmental entities from losses relating to certain activities. Specifically, the ITCA immunities are enumerated in Indiana Code Section 34-13-3-3. The ITCA "is comprehensive, and unless the activity giving rise to the tort falls within certain enumerated exceptions, governmental entities and their employees are subject to liability for the torts they commit." *State v. Willits*, 773 N.E.2d 808, 814 (Ind. 2002).

"Whether the ITCA imparts immunity to a governmental entity is a question of law for the court to decide." *State v. Lucas*, 223 N.E.3d 253, 258 (Ind. Ct. App. 2023) (cleaned up). "The question may require an extended factual development, but the essential inquiry is whether the challenged act is the type of function which the legislature intended to protect with immunity."

33

*City of Indianapolis v. Duffit*, 929 N.E.2d 231, 236 (Ind. Ct. App. 2010). "The party seeking immunity bears the burden of proving that its conduct falls within the provisions of the ITCA." *Schon v. Frantz*, 156 N.E.3d 692, 699 (Ind. Ct. App. 2020). "Because the ITCA is in derogation of the common law, it must be strictly construed against limitations on a claimant's right to bring suit. *Lucas*, 223 N.E.3d at 258–259 (citing *Schoettmer*, 992 N.E.2d at 706). The Indiana Supreme Court has emphasized that "[a]t common law and by statute government *liability* for tortious conduct is the rule while immunity is the exception." *Id*. (quoting *Ladra v. State*, 177 N.E.3d 412, 416 (Ind. 2021)).

The City contends that it is immune from liability under Indiana Code § 34-13-3-3(a) because its conduct falls within six of the enumerated statutory provisions: Indiana Code §§ 34-13-3-3(a)(7), (8), (10), (12), (19) and (22) (Filing No. 241 at 39–51). The Court will address each in turn.

### i.   Section 34-13-3-3(a)(7)

Indiana Code § 34-13-3-3(a)(7) provides immunities for claims against a governmental entity for the performance of a discretionary function. Indiana courts "apply the 'planning-operational' test to determine whether a governmental entity has engaged in a discretionary function that is immune from liability under the ITCA." *Lucas*, 223 N.E.3d at 259.

> Under this test, if the decision of the governmental entity was a "planning" activity, that is a function involving the formulation of basic policy characterized by official judgment, discretion, weighing of alternatives, and public policy choices, then the decision is discretionary and immune under Indiana Code Section 34-13-3-3(a)(7). Government decisions about policy formation in which involve assessment of competing priorities, a weighing of budgetary considerations, or the allocation of scarce resources are also planning activities. On the other hand, if the function is "operational," for example decisions regarding only the execution or implementation of already formulated policy, the function is not discretionary under the statute and no immunity attaches.

*Id.* (cleaned up).

The City contends that the alleged failure to remediate the fire hazard was an extended and detailed planning and policy decision that constitutes the performance of a discretionary function (Filing No. 241 at 46–47). Specifically, the City contends that it gained ownership over the 310/358 Properties because of its brownfield investigations, and that it initially pursued action against My-Way to remove the materials and address the conditions on the 310/358 Properties but later chose not to take any additional legal action. The City points to their former attorney, Sickmann's, second affidavit where he states, "[t]he City considered taking additional legal action against My-Way, but due to multiple factors, the City did not direct me to initiate legal action to secure possession and control over the 310[/]358 Properties." (Filing No. 238-6 at 4 ¶16).

The Plaintiffs respond that the City's conduct here, including its failure to remedy Building Commission orders, to abate known fire code violations, and to restrict or remove hazardous plastic materials from property it owned, does not involve high-level policymaking (Filing No. 251 at 45). Rather, such actions are routine code enforcement and property maintenance duties. The Plaintiffs also argue that once a government entity has adopted a course of action, such as issuance of a safety order, its implementation becomes a ministerial function not protected by immunity. The Court agrees.

First, the City's decision to purchase the 310/358 Properties, while a policy decision, is irrelevant. None of Plaintiffs' allegations concern how or why the City became the owner of the 310/358 Properties. Rather, the Plaintiffs allege that the City failed to enforce the Building Commission orders, to abate known fire code violations, and remediate the fire hazards contained on its property.

Second, it is the City's burden to prove that its alleged inaction was a policymaking choice. But here, the only evidence the City points the Court to in support of its contention is Sickmann's statement that "due to multiple factors, the City did not direct me to initiate legal action to secure possession and control over the 310[/]358 Properties." The Indiana Supreme Court has made clear that immunity for discretionary functions does not protect all mistakes of judgment. *Peavler v. Board of Comm'rs*, 528 N.E.2d 40, 45 (Ind. 1988). The Indiana Supreme Court also stated that,

> The discretionary function exception insulates only those significant policy and political decisions which cannot be assessed by customary tort standards. In this sense, the word discretionary does not mean mere judgment or discernment. Rather, it refers to the exercise of political power which is held accountable only to the Constitution or the political process.

*Id*. (internal citation omitted). The mere fact that the City did not ask Sickmann to initiate legal action is insufficient to prove such decision was a "significant policy and political decision[] which cannot be assessed by customary tort standards." *Id*. Accordingly, Ind. Code § 34-13-3-3(a)(7) does not bar Plaintiffs' claims.

### ii.  Section 34-13-3-3(a)(8)

Indiana Code § 34-13-3-3(a)(8) grants immunity from claims against a governmental entity for adoption and enforcement of or failure to adopt or enforce any law, including rules and regulations. "For purposes of [this section], 'enforcement' has been defined as 'those activities in which a government entity or its employees compel or attempt to compel the obedience of another to laws, rules or regulations, or sanction or attempt to sanction a violation thereof.'"

The Indiana Supreme Court has held that the language of this Section "restricts immunity to the adoption and enforcement of laws (and a failure to do so) which are within the assignment of the governmental entity and the legislature intended that a governmental entity be immune only for failing to adopt or enforce a law that falls within the scope of the entity's purpose or

36

operational power." *Johnson v. Marion County Coroner's Office*, 971 N.E.2d 151, 157–158 (Ind. Ct. App. 2012) (citing *King v. Northeast Security, Inc.*, 790 N.E.2d 474, 482 (Ind. 2003)).

The City argues that Plaintiffs allege that the City failed to exercise reasonable care in the oversight and maintenance of the 310/358 Properties and failed to remediate fire hazards and unsafe conditions which were subject to orders to remediate, and, therefore, the Plaintiffs are asserting that the City failed to compel obedience of My-Way to laws (Filing No. 241 at 40). The Plaintiffs respond that the City was not a passive regulator who failed to enforce a law but instead a property owner with full legal authority and a duty to maintain its property and prevent foreseeable harm to its neighbors (Filing No. 251 at 39). The Court agrees.

The crux of Plaintiffs' Second Amended Class Action Complaint is that the City failed to use reasonable care and allowed a known fire hazard to persist on property it owned despite years of notice and opportunities to remedy the danger. Moreover, the mere fact that the Building Commission orders were issued against My-Way does not lead to the conclusion that Plaintiffs' claims concern the City's failure to enforce the Building Commission orders. The Building Commission orders were also not orders "that fall within the scope of the City's purpose or operational power" as a landowner. *Johnson*, 971 N.E.2d at 157–158. Accordingly, the City is not entitled to immunity under this provision because the Plaintiffs do not allege that the City failed to adopt or enforce any law within the meaning of this provision.

### iii. **Section 34-13-3-3(a)(10)**

Indiana Code § 34-13-3-3(a)(10) provides immunity for the act or omission of anyone other than the governmental entity or the governmental entity's employee. The City argues that it cannot be held liable for the acts or omissions of My-Way, who is the party responsible for the accumulation of combustible materials on the 310/358 Properties (Filing No. 241 at 49).

37

While the City correctly deduces that it cannot be liable for an act or omission of a third party, the Plaintiffs' claims are separate and distinct not necessarily arising from any negligence by My-Way. *See Henshilwood v. Hendricks Cnty.*, 653 N.E.2d 1062, 1066 (Ind. Ct. App. 1995) (holding that plaintiffs' claims against the county for failing to maintain a ditch containing raw sewage and failing to prevent the spread of communicable diseases were separate from the negligence of a third party whose property the raw sewage flowed from). Moreover, as the Court concluded above, a reasonable jury could find the City negligent on its own. Accordingly, this provision of the ITCA does not bar Plaintiffs' claims.

### iv.  Section 34-13-3-3(a)(12)

Indiana Code § 34-13-3-3(a)(12) provides immunity for the "failure to make an inspection or making an inadequate or negligent inspection, of any property, other than the property of a governmental entity, to determine whether the property complied with or violates any law or contains a hazard to health or safety." The City argues that "to determine whether there were existing fire code violations or other unsafe conditions that the City needed to correct when it became title owner of the 310/358 Properties, an inspection of those properties would have needed to be performed." (Filing No. 241 at 40). The City then asserts that Plaintiffs' liability arguments also generally center on the City's failure to inspect the 308 Property owned by My-Way. The City is wrong.

First, this Section only applies to property "other than the property of a governmental entity." Ind. Code § 34-13-3-3(a)(12). The 310/358 Properties were owned by the City. Second, Plaintiffs' allegations have nothing to do with an inspection. As previously stated throughout this Order, Plaintiffs claims are for failing to abate a known fire hazard. The simple fact that the City would have to look at the property or "inspect" it does not transform this case into a failure to

38

inspect issue. The Plaintiffs' claims against the City are also entirely separate from My-Way's operations on the 308 Property. Plaintiffs do not allege that the City engaged or failed to engage in any conduct relating to the 308 Property. This Section does not bar Plaintiffs' claims.

### v.  Section 34-13-3-3(a)(19)

Indiana Code § 34-13-3-3(a)(19) provides immunity for the "development, adoption, implementation, operation, maintenance, or use of an enhanced emergency communication system." The City argues that to the extent that Plaintiffs are seeking any damages from the City based on the Wayne County Emergency Management Agency alerts and their evacuation and can establish City involvement in issuing the alerts, the City is protected by this ITCA provision (Filing No. 251 at 48).

The Plaintiffs do not allege any such damages. The Second Amended Class Action Complaint does not challenge the content, timing, or effectiveness of any emergency alert and does not seek damages for failure to warn or for delayed evacuation. As discussed above, the alleged injuries stem from the City's alleged negligence in allowing hazardous, combustible materials to remain on its land despite years of warning. At no point do the Plaintiffs indicate any claims or damages related to the City's involvement or lack thereof in the Wayne County Emergency Management Agency alerts. This Section of the ITCA is inapplicable.

### vi.  Section 34-13-3-3(a)(22)

Indiana Code § 34-13-3-3(a)(22) provides immunity for an act taken to investigate or remediate hazardous substances, petroleum, or other pollutants associated with a brownfield. The City argues that the intent of this statute was to encourage governmental entities, like the City, to take title to and redevelop brownfields, such as the 310/358 Properties, without fear of inheriting liability that prior owners or operators had created through their use of the property (Filing No.

241 at 42 (citing *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280–1283 (Ind. 2009)). The City adds that there is no dispute that the 310/358 Properties were brownfields and Plaintiffs' claims rely in part on the City's ownership of the properties. The City surmises that this ITCA provision therefore provides them immunity. The Court does not agree.

The City appears to misunderstand the Plaintiffs' claims. Section 34-13-3-3(a)(22) provides immunity for "an act taken to investigate or remediate hazardous substances" at a brownfield. Ind. Code § 34-13-3-3(a)(22). But the Plaintiffs' claims specifically rely on the City's *inaction*. The crux of Plaintiffs' Second Amended Class Action Complaint is that the City *failed* to remediate hazardous materials. Not that the City took meaningful steps to actually remediate the issue. Further, Plaintiffs' claims do not stem from the act of the City taking title to the property. As discussed throughout this Order, the Plaintiffs do not take issue or even indicate that the City's taking title to the 310/358 Properties caused any damages or was in any way wrongful. Their claims focus on the *inaction* on the part of the City after taking title to the 310/358 Properties. Logic dictates that a claim premised on *inaction* is not barred by a provision barring claims for "an act taken." Ind. Code § 34-13-3-3(a)(22). As the Plaintiffs point out, failing to keep one's property in a safe condition, even if that property happens to be a brownfield, is not "an act taken to investigate or remediate" anything. *Id*. This provision does not bar Plaintiffs' claims.

The Court finds that the City has failed to carry its burden to prove that any of the ITCA provisions above provide it immunity against Plaintiffs' claims. Accordingly, Plaintiffs' claims are not barred by the ITCA.

### d. **Contributory Negligence**

In Indiana, claims against governmental entities are subject to a contributory negligence analysis. *Penn Harris Madison School Corp. v. Howard*, 861 N.E.2d 1190, 1193 (Ind. 2007).

40

Under that framework, "even a slight degree of negligence on the part of [Plaintiffs], if proximately contributing to [their] claimed damages, will operate as a total bar[.]" *Funston v. School Town of Munster*, 849 N.E.2d 595, 598 (Ind. 2006). A plaintiff is contributorily negligent when his conduct "falls below the standard to which he should conform for his own protection and safety. Lack of reasonable care that an ordinary person would exercise in like or similar circumstances is the factor upon which the presence or absence of negligence depends." *Jones v. Gleim*, 468 N.E.2d 205, 207 (Ind. 1984).

The City argues that Craig disregarded the EPA's instructions relating to the debris from the fire and performed his own cleanup of his property despite the EPA offering to do so for free; therefore, Craig is contributorily negligent for Plaintiffs' claimed damages from the City for the debris cleanup and Craig's fall from the ladder he used during the cleanup (Filing No. 241 at 51). The Plaintiffs point to Craig's testimony that he did not pick up any debris and was injured when he fell off a ladder in late July 2023 cleaning his home's gutters and power washing his white house because of the dark color resulting from the fire (Filing No. 251 at 49). Under these circumstances, the City has not shown that  Plaintiffs were contributorily negligent.

Contrary to the City's assertions, Craig testified that he did not touch his property because the EPA said that someone would perform the clean-up for him (Filing No. 251-15 at 26, pp. 98:8–24). There is no evidence that Craig was negligent when he fell off his ladder while cleaning out his gutters and pressure washing his siding. The Court is also unaware of any authority, and the City does not cite any, which indicates that the mere act of pressure washing one's home— the only act the City designates as its evidence—constitutes negligence. Accordingly, Craig was not contributorily negligent.

### e. **Damages Theories**

Plaintiff's final claim for relief—Count VII—alleges that "[t]he Defendants' actions, jointly and individually, demonstrate malice, aggravated or egregious fraud and oppression, with a conscious disregard for the rights of other persons with a great probability of causing substantial harm, and entitle Plaintiffs and the Classes they represent to punitive damages." (Filing No. 72 at 14). Plaintiffs further seek damages for personal injury, and evacuation. *Id.*

The City argues that Plaintiffs' claims for punitive, personal injury, and evacuation damages all fail as a matter of law (Filing No. 241 at 51–52). Regarding punitive damages, "Indiana law does not allow punitive damages against governmental entities." *Reiner v. Dandurand*, 33 F. Supp. 3d 1018, 1034 (N.D. Ind. 2014) (citing Ind. Code § 34-13-3-4; *Kelley v. City of Michigan City*, 300 F. Supp. 2d 682, 690 (N.D. Ind. 2004)). The Plaintiffs appear to concede this point as they provide no opposing argument in their response brief. Accordingly, summary judgment motion is **granted** as to Plaintiffs' claims for punitive damages.

Concerning personal injury damages, the City contends that Plaintiffs are required to prove causation through scientific expert testimony (Filing No. 241 at 52 (citing *Porter v. Whitehall*, 791 F. Supp. 1335, 1341–42 (S.D. Ind. 1992)). In their Response, Plaintiffs argue that they are not required to present expert testimony because their personal injury damages consist of headaches from common smoke inhalation and anxiety rather than latent diseases after years-long toxic exposure (Filing No. 251 at 50 (citing *Willis v. Westerfield*, 839 N.E.2d 1179, 1188 (Ind. 2006)). Both parties are persuasive.

"In Indiana, general causation establishes 'whether the substance at issue had the capacity to cause the harm alleged,' whereas specific causation establishes 'whether a particular individual suffers from a particular ailment as a result of exposure to a substance.'" *C.W. v. Textron, Inc.*, No.

3:10-cv-87, 2014 U.S. Dist. LEXIS 141593, at *8 (N.D. Ind. Oct. 3, 2014) (quoting *7-Eleven, Inc. v. Bowens*, 857 N.E.2d 382, 389 (Ind. Ct. App. 2006)). However, the Indiana Supreme Court reiterated the following principle:

> The necessity of expert medical testimony to establish a causal connection generally depends upon the nature of the medical question involved. Thus, expert testimony is required where the question involves medical factors beyond the common knowledge of the layman such that the jury could only indulge in speculation in making a finding based thereon. However, on medical matters which are within the common experience, observation, or knowledge of laymen, no expert testimony is required to permit a conclusion on causation.

*Willis*, 839 N.E.2d at 1188 (quoting *Johnson v. Bender*, 174 Ind. App. 638, 644 (Ind. Ct. App. 1977).

Plaintiffs are correct that damages for medical conditions within the common knowledge of a layperson, such as headaches and anxiety due to smoke inhalation from a large fire, do not require expert testimony. Thus, Plaintiffs may pursue damages for those types of injury if a jury finds the City liable. However, damages due to exposure to the noxious materials would likely require expert testimony—which Plaintiffs have not provided. Accordingly, summary judgment motion is **granted in part and denied in part**. The Motion is **granted** as to personal injury damages that require an expert's knowledge and testimony—such as claims that Plaintiffs suffered latent disease or medical conditions due to exposure to the noxious materials from the fire. However, the Motion is **denied** for Plaintiffs' claimed personal injury damages such as headaches and anxiety.

Finally, the City argues the Plaintiffs' claims for evacuation damages are barred by the ITCA for the use of an enhanced emergency communication system. As discussed above, Plaintiffs' claims are not barred by the ITCA and do not allege any wrongful conduct in

43

connection with the issuance of the Wayne County Emergency Management Agency alerts. Accordingly, Plaintiffs' claims for evacuation damages shall proceed.

### f.   Conclusion

For the reasons discussed above, the City's Motion for Summary Judgment (Filing No. 237) is **granted in part and denied in part**. Summary judgment is granted for Count I: Strict Liability, Count III: Res Ipsa Loquitur, Count V: Trespass, and Count VI: Battery. The Motion is also granted for personal injury damages which require expert testimony but denied for those damages such as headaches and anxiety. Summary judgment is denied for Count II: Negligence and Count IV: Private Nuisance, and these claims against the City may proceed.

### 2.   Cornerstone's Motion as to Claims Against Smith

Cornerstone—CTG and Smith—has moved for partial summary judgment on the Plaintiffs' claims against Smith in his individual capacity arguing that there is no basis for piercing the corporate veil and holding him liable personally (Filing No. 233 at 10). Specifically, Cornerstone argues that Smith has presented evidence showing observance of corporate formalities, sufficient capitalization and existence of corporate records, separate tax documents, and that CTG alone owned the 308 Property. *Id*. at 11.  Plaintiffs assert two arguments for holding Smith personally liable: (1) he personally committed tortious acts; and (2) there is sufficient evidence to support piercing the corporate veil.

### a.   Personal Liability

Indiana law recognizes that officers and agents of a corporation are not insulated from personal liability when they themselves commit or participate in tortious conduct. *State Civil Rights Comm'n v. Cnty. Line Park, Inc.*, 738 N.E.2d 1044, 1050 (Ind. 2000). Plaintiffs contend that Smith personally directed operations on the 310/358 Properties, including decisions about

44

hazardous materials, site access, and interactions with regulators, and personally interfered with and delayed governmental remediation efforts. Specifically, the Plaintiffs point to City reconnaissance team member Beth Fields' testimony that Smith "threatened [the reconnaissance team] that [they] could not come on the [310/358 Properties], that [they] were not able to access that property, that it was [Smith's] property and his inventory." (Filing No. 251 at 51 (quoting Filing No. 251-8 at 25 pp. 99:8–11)). Plaintiffs also point out that Smith, after receiving various notices of violations for fire hazards, personally met with City officials and engaged in negotiations over site cleanup. Smith then represented, through his attorney, that he had "cured" various violations and planned to remove millions of pounds of recyclables in 2019, yet those conditions largely persisted through the 2023 fire. *Id*. at 51–52 (citing Filing No. 238-1 at 231–233, pp. 228:24–230:4, 400–401, pp. 394:20–395:7).

The Court finds that a reasonable jury could find Smith liable for his tortious conduct. An officer of a corporation "is generally not personally liable for the torts of the corporation or other officers or agents merely because of her office. However, an officer is personally liable for the torts in which she has participated or which she has authorized or directed." *Cnty. Line Park*, 738 N.E.2d at 1050 (cleaned up) (citing *Palace Bar, Inc. v. Fearnot*, 376 N.E.2d 1159, 1169 (Ind. Ct. App. 1978), *vacated on other grounds*; *Gable v. Curtis*, 673 N.E.2d 805, 809 (Ind. Ct. App. 1996) ("It is well-settled that a corporate officer cannot escape liability for fraud by claiming that he acted on behalf of the corporation when that corporate officer personally participated in the fraud."); Ind. Code § 23-1-26-3(b) [the Business Corporations Act] ("Unless otherwise provided in the articles of incorporation, a shareholder of a corporation is not personally liable for the acts or debts of the corporation except that the shareholder may become personally liable by reason of the shareholder's own acts or conduct.")); *see also Commissioner v. RLG, Inc.*, 755 N.E.2d

556, 560 (Ind. 2001) ("As a matter of general criminal law, an individual who participates in a criminal violation is criminally responsible even if acting in a corporate capacity. The same is true of civil tort liability.") (internal citations omitted).

Here, Smith participated in the alleged torts. Specifically, Smith was responsible for the accumulation of millions of pounds of combustible materials despite repeated orders to remedy such conditions. There is evidence that Smith also personally interfered with the City's ability to conduct reconnaissance on the 310/358 Properties (Filing No. 251-8 at 25, pp. 99:8–11). Moreover, Smith admitted to storing inventory and conducting improvements on the 310/358 Properties without seeking permits or authority from the City despite knowing the 310/358 Properties were owned by the City (Filing No. 238-1 at 226–227, pp. 223:1–224:17). Accordingly, a reasonable jury could find that Smith's own conduct, not merely that of his entities, caused the very harms at issue in this case and his partial summary judgment motion is **denied**.

b.  **Piercing the Corporate Veil**

Plaintiffs argue that piercing the corporate veil is warranted because Smith commingled assets, transferred assets to avoid liability, failed to observe corporate formalities, used the corporate form to evade regulation and risk, and asserted control and used the corporate form as an instrumentality (Filing No. 251 at 53–54). Specifically, Plaintiffs contend that Smith used My-Way Trading funds to purchase a personal residence and while he claims those funds were recognized as personal income, he does not have the tax documentation to substantiate that characterization. Plaintiffs contend that Smith transferred assets to avoid liability by transferring My-Way Trading's assets to CTG after My-Way Trading's bankruptcy without consideration or arms-length negotiation. Plaintiffs argue that Smith failed to observe corporate formalities because he admits that he undertook improvements to real property without distinguishing which

entity was acting, and while he claims that My-Way Trading and CTG maintained separate books, bank accounts, and tax filings, he relies on his own personal affidavit rather than financial records which are absent. Plaintiffs argue that Smith used the corporate form to evade regulation and risk by negotiating and then disregarding repeated orders to remedy the fire hazards. Finally, Plaintiffs argue that Smith is the sole owner and president of both entities, admits to personally negotiating property acquisitions, compliance with building orders, sale of inventory, and even physical access to the properties but does not distinguish in his conduct or communications between himself and his entities.

Even if Smith had not personally engaged in the alleged tortious acts, the Court finds there is sufficient evidence for a reasonable jury to pierce the corporate veil. Indiana's seminal case on piercing the corporate veil is *Aronson v. Price*, 644 N.E.2d 864 (Ind. 1994). In *Price*, The Indiana Supreme Court held that a party may pierce the corporate veil if they can prove "that the corporate form was so ignored, controlled or manipulated that it was merely the instrumentality of another and that the misuse of the corporate form would constitute a fraud or promote injustice." *Id*. at 867. In deciding whether a plaintiff has met this burden of proof, Indiana courts must consider whether the plaintiff has presented evidence showing:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent representation by corporation shareholders or directors; (4) use of the corporation to promote fraud, injustice or illegal activities; (5) payment by the corporation of individual obligations; (6) commingling of assets and affairs; (7) failure to observe required corporate formalities; or (8) other shareholder acts or conduct ignoring, controlling, or manipulating the corporate form.

*Id*. Here, Smith admits to using My-Way Trading funds to buy his personal residence, (Filing No. 236-1 at 9 ¶43), and transferring all of My-Way Trading's assets, including real property, to CTG following My-Way Trading's dismissal of Chapter 11 bankruptcy. *Id*. at 5–6 ¶¶25–26. Smith also

claims that My-Way Trading and CTG maintained separate books, bank accounts, and tax filings but financial records proving that are absent from the record. Finally, as discussed above, Smith participated personally in the alleged tortious conduct and is the sole owner and president of both My-Way Trading and CTG.

Smith claims to have lost financial records in the fire at issue in this case. For example, Smith argues that the My-Way Trading funds used for his personal residence were recognized as personal income. Smith is correct that the City could request certain tax returns showing that My-Way Trading and CTG were used as alter-egos. Accordingly, while it may be that CTG's corporate veil should be pierced, this determination should not be made on summary judgment. *See Cmty. Care Ctrs., Inc. v. Hamilton*, 774 N.E.2d 559, 565 (Ind. Ct. App. 2002) ("[T]he determination of whether there are sufficient grounds for piercing the corporate veil ordinarily should not be disposed of by summary judgment, in view of the complex economic questions often involved[.]"); *see also Konrad Motor & Welder Serv. v. Magnetech Indus. Servs.*, 973 N.E.2d 1158, 1164 (Ind. Ct. App. 2012) ("While the facts do not appear to be in dispute, summary judgment is inappropriate where the undisputed facts themselves give rise to conflicting inferences which would alter the outcome."). Thus, even if Smith did not personally participate in the alleged tortious conduct, he is not entitled to summary judgment given that conflicting inferences can be drawn from the facts on whether the corporate veil should be pierced.

Because Smith personally participated in the alleged torts and conflicting inferences can be drawn as to whether the corporate veil should be pierced, Smith's partial summary judgment motion is **denied** as to Plaintiffs' claims.

48

B.    **The City's Crossclaim**

Pursuant to Federal Rules of Civil Procedure 13(g) and (h), the City filed their Crossclaims against My-Way alleging the following counts: Count I: Trespass; Count II: Nuisance; Count III: Negligence; Count IV: Violation of Indiana's Anti-Dumping Statute (Ind. Code § 13-30-3-13); and Count V: Environmental Legal Action (Filing No. 77). The City now moves for partial summary judgment arguing they are entitled to summary judgment on liability for Count I: Trespass and Count V: Environmental Legal Action (Filing No. 254 at 19). The City also argues that Smith is personally liable to them under the responsible corporate officer doctrine or the direct participant theory. The Court will address these arguments in turn.

1.   **Count I: Trespass**

As previously stated in Section A(1)(a)(v) concerning Plaintiffs' allegations of trespass, a plaintiff claiming civil trespass must demonstrate: (1) possession of the land when the trespass occurred; and (2) that the defendant entered the land without a legal right to do so. *KB Home Ind.*, 928 N.E.2d at 308. "The defendant in a trespass action need not have personally entered upon the plaintiff's land" and may commit a trespass by causing a thing to enter the land. *Reed v. Reid*, 980 N.E.2d 277, 294 (Ind. 2012). The Indiana Court of Appeals has consistently held that to be responsible for trespass a defendant must have committed an intentional act:

> A trespasser cannot be held liable unless a voluntary act caused his entry onto the plaintiff's property . . . . Although it is not necessary that the trespasser intend to commit a trespass or even that he know that his act will constitute a trespass, it is required for the trespass that there be an intentional act and an intent to do the very act which results in the trespass.

*Cure*, 937 N.E.2d at 1236 (cleaned up).

The parties do not dispute that the City owned the 310/358 Properties and that My-Way conducted business by storing millions of pounds of plastics on the 310/358 Properties. Rather

49

the parties dispute the second element—whether My-Way had a legal right to conduct its business and store plastics on the 310/358 Properties. The City argues they never consented to these activities once they became the owner of the 310/358 Properties (Filing No. 254 at 25). The City adds that any implied consent was withdrawn when the City wrote to My-Way's then-counsel specifically instructing My-Way to "immediately begin the process of vacating" the 310/358 Properties (Filing No. 238-6 at 2–3 ¶9).

My-Way responds that a genuine issue of material fact remains concerning whether they were licensees—therefore having the legal right to remain on the land by virtue of the City's permission or sufferance—instead of trespassers (Filing No. 274 at 14). My-Way argues that the City honored its right to occupy and control the 310/358 Properties when the City's counsel merely informed My-Way that the City's environmental consultant needed to access the 310/358 Properties rather than ordering My-Way to vacate. My-Way continues that the City's assertion of unauthorized entry is inconsistent with the history of the parties' relationship. My-Way also proffers the following hypothetical: if the City considered My-Way to be trespassing, the City would have initiated a claim for trespass before the fire occurred.

As My-Way points out, "licensees have a privilege to enter or remain on the land by virtue of the landowner's permission or sufferance." *Draper v. Manheim Remarketing, Inc.*, No. 1:22-cv-02434, 2024 U.S. Dist. LEXIS 72265, at *7 (S.D. Ind. March 25, 2024). "The term 'permission' means that the landowner's 'conduct gives the entrant reason to believe that the [landowner] is willing to allow him or her to enter if he or she desires to do so.'" *Id.* (quoting *Kopcynski v. Barger*, 887 N.E.2d 928, 932 (Ind. 2008)) (alteration in original). Yet, My-Way fails to designate any evidence in the record to show that the City was willing to allow My-Way to enter if they desired to do so. The only evidence placed before the Court by My-Way is Smith's

own assertion that the City let My-Way use the 310/358 Properties to secure it from vagrants. Smith argues that the City's assertion of "unauthorized entry" for trespass is inconsistent with the history of MWT's/CTG's use of the Properties and ongoing communications with Wayne County Commissioners regarding acquisition and My-Way's continued efforts to comply with the Building Commission orders (Filing No. 274 at 14).

However, the evidence in the record contradicts such arguments. For example, the City specifically demanded that My-Way vacate the 310/358 Properties (Filing No. 238-6 at 2–3 ¶9). The City also defended the Building Commission orders which indicated that My-Way's conduct was a clear danger to the population. *Id*. at 4 ¶16. The mere fact the City failed to file a trespass claim does not overcome the weight of the evidence to the contrary.

Accordingly, the Court finds that no reasonable jury could conclude that My-Way had permission to enter the 310/358 Properties. The City's motion for partial summary judgment is **granted** for Count I: Trespass of their Crossclaim.

## 2. Count V: Environmental Legal Action

Indiana's Environmental Legal Action ("ELA") statute provides that:

A person may, regardless of whether the person caused or contributed to the release of hazardous substance or petroleum into the surface or subsurface soil or groundwater that poses a risk to human health and the environment, bring an environmental legal action against a person that caused or contributed to the release to recover reasonable costs of removal or remedial action involving the hazardous substances or petroleum.

Ind. Code § 13-30-9-2. The term "person" is broadly defined and includes the City, Smith and his two companies. *See* Ind. Code § 13-11-2-158(a). A city may pursue a claim under the ELA. *City of Gary, Ind. v. Shafer*, 683 F. Supp. 2d 836, 860 (N.D. Ind. 2010) (citing *Cooper Inus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1284 (Ind. 2009)). "Under this statute, 'caused or contributed'

requires some involvement by the actor which produces a result." *Id*.; *Reed*, 980 N.E.2d at 289. The goal "when construing the phrase 'cause or contribute' should be to hold accountable all parties 'responsible for creating environmental contaminations.'" *JDN Props., LLC v. VanMeter Enters.*, 17 N.E.3d 357, 360 (Ind. Ct. App. 2014) (quoting *Cure*, 937 N.E.2d at 1234).

The City argues that My-Way began accumulating material—such as plastics, metals, cardboard, transformers, relay switches, batteries, and power supplies at the 310/358 Properties in approximately 2010 and continued to do so until the fire (Filing No. 254 at 21). The City also refers to their disclosed expert Chris Abel's ("Abel") conclusion that "My-Way's operations caused and contributed to multiple releases of hazardous substances into the environment" at the 310/358 Properties (Filing No. 253-8 at 14:17–18). Abel arrived at this conclusion after his company conducted an investigation of subsurface soils and groundwater at the 310/358 Properties in July 2024 showing that soils at the 310/358 Properties have been impacted by arsenic, 1,2-dichloroethane, total chromium, hexavalent chromium, lead, and perfluorooctanoic acid above regulatory levels. *Id*. at 12:11–17. The City then argues that Abel's conclusion establishes My-Way's liability under the ELA and the City incurred costs—which are recoverable under the ELA—to bring this claim. The City then requests the Court hold a hearing under Ind. Code § 13-30-9-3 to allocate the costs, including an award of costs and attorneys' fees (Filing No. 254 at 23).

In their Response, My-Way argues that there was pre-existing contamination on the 310/358 Properties causing a material question of fact to remain on whether My-Way "caused or contributed" to the hazardous releases on the 310/358 Properties (Filing No. 274 at 15). My-Way cites to a 2009 Indiana Department of Environmental Management ("IDEM") inspection of the 358 Property which noted concerns and the presence of fuel oil tanks, oily wastes, unknown

substances, and other potentially hazardous materials. *Id*. (citing Filing No. 257-11 at 3–6, pp. 32:21–35:18). My-Way also points to a 2013 Environmental Review and Site Assessment of the 358 Property which confirmed the presence of the materials from the 2009 IDEM inspection and identified asbestos-containing materials. *Id*. (citing Filing No. 257-13 at 3–7). My-Way argues that the presence of such preexisting contamination contradicts Abel's conclusion that it caused and contributed to releases of hazardous substances. My-Way argues that the releases were instead caused by a non-party, which is a defense to an ELA claim (Filing No. 274 at 15 (citing Ind. Code § 13-30-9-5)).

Abel's expert report provides overwhelming evidence that My-Way caused or contributed to the releases of hazardous substances. Abel's qualifications are not contested, and he thoroughly explains his conclusions, the data and events he relied upon to arrive at those conclusions, and how such data was collected (*see* Filing No. 253-8). Moreover, while the Court acknowledges the 2009 and 2013 assessments indicating the presence of asbestos-containing material and other potentially hazardous substances on the 358 Property, the ELA imposes liability on any person who causes *or contributes* to the releases of hazardous substances. *See* Ind. Code § 13-30-9-2. The ELA seeks to hold "accountable *all* parties responsible for creating environmental contaminations." *VanMeter Enters.*, 17 N.E.3d at 360 (internal quotation marks and citation omitted) (emphasis added). My-Way does not have to be the only party liable; all that is required for a party to be liable under the statute is that they had "some involvement . . . which produces a result." *Reed*, 980 N.E.2d at 289. The presence of preexisting contamination might bear on damages, *see* Ind. Code § 13-30-9-5, but given the thoroughness of Abel's expert report, and the lack of contradictory evidence, no reasonable jury could conclude that My-Way did not, at the very least, contribute to the releases of hazardous substances. Accordingly, the City's partial

summary judgment motion is also **granted** as to Count V: Environmental Legal Action on liability.

### 3. City's Request for a Hearing

This brings the Court to the City's request for a hearing to allocate costs and award attorneys' fees in connection with the ELA suit, which is imbedded in its briefing. (Filing No. 254 at 23). Indiana Code § 13-30-9-3 states that "a court shall allocate the costs of the removal or remedial action in proportion to the acts or omissions of each party . . . using legal and equitable factors that the court determines are appropriate," including seven factors the Court need not enumerate here. Given that claims remain pending in this litigation, and My-Way's lack of response on whether a hearing will be necessary, this request is **denied without prejudice.** The request for a hearing is premature. The parties should first confer about whether and when a hearing on damages on the City's Crossclaim should be held. If a hearing is necessary, the City may file a separate motion, and Smith will have an opportunity to respond.

### 4. Smith's Personal Liability

Lastly, the City argues that Smith is personally liable under the direct participant theory or the responsible corporate officer doctrine (Filing No. 254 at 26). First, as the Court found above in Section A(2), Smith is liable personally under the direct participant theory of liability. Second, though the Court need not continue to the responsible corporate officer doctrine, the Court will provide a brief discussion as alternative grounds for its decision.

Under some circumstances, "an individual associated with a corporation may be personally liable under the responsible corporate officer doctrine for that corporation's violations of the Indiana [ELA], whether or not the traditional doctrine of piercing the corporate veil would

produce personal liability." *RLG, Inc.*, 755 N.E.2d at 558. The Indiana Supreme Court adopted the standard of a responsible corporate officer as:

> (1) the individual must be in a position of responsibility which allows the person to influence corporate policies or activities; (2) there must be a nexus between the individual's position and the violation in question such that the individual could have influenced the corporate actions which constituted the violations; and (3) the individual's actions or inactions facilitated the violations.

*Id.* at 561 (quoting *Matter of Dougherty*, 482 N.W.2d 485, 490 (Minn. Ct. App. 1992)). The doctrine applies to public welfare offenses if they result in strict liability for all those who have a responsible share in the offense. *Id.*

The City points out that Smith is the sole shareholder of My-Way Trading and the sole member of CTG, he was solely responsible for hiring for both companies, he admitted to being solely responsible for environmental, health and safety regulatory compliance for both companies, and he admitted that he was solely responsible for the decision to stockpile materials at the 310/358 Properties (Filing No. 254 at 28 (citing Filing No. 238-1 at 602–603, pp. 593:16–594:13).

In their Response, My-Way appears to concede Smith's liability under the responsible corporate officer doctrine and the direct participant theory stating, "[w]hile these doctrines may provide alternative avenues for individual liability, they do not negate the need to address Smith's Motion for Partial Summary Judgment on the piercing the corporate veil issue." (Filing No. 274 at 19). My-Way provides no further argument on the responsible corporate officer doctrine beyond merely pointing out that it applies to public welfare offenses that impose strict liability by statute such as the ELA.

Smith satisfies all three elements of the responsible corporate officer doctrine. He was the sole shareholder/member/owner of both companies, admitted that he was the sole individual

responsible for accumulating the hazardous material on the 310/358 Properties, and as the Court found above, his inactions violated the ELA by contributing to the releases of hazardous substances. Accordingly, in addition to finding Smith liable under the direct participant, he is also personally liable under the responsible corporate officer doctrine for violations of the ELA.

In summary, the Court **grants** the City's Motion for Partial Summary Judgment on liability but **denies** the premature request for a hearing on hearing subject to refiling.

C.    **Cornerstone Trading Group, LLC's ("CTG") Third-Party Complaint**

CTG filed a Third-Party Complaint against the City asserting a single claim: "To the extent that it is determined that [CTG] is liable to the Plaintiffs, the City . . . is responsible to [CTG] for any and all damages which may be awarded to the Plaintiffs." (Filing No. 1-2 at 71 ¶19). The City now moves for summary judgment on that claim (Filing No. 237). The City argues that they are entitled to summary judgment for four reasons: (1) CTG never filed a tort claim notice with the City asserting the indemnification claim; (2) CTG's claim is premised on it being found liable and, in Indiana, a party may only bring an indemnification action if they are without fault; (3) CTG was contributorily negligent; and (4) the City has immunity for the same reasons they have immunity from Plaintiffs' claims (Filing No. 241). The Court will address each in turn.

1.    **Tort Claim Notice**

As discussed above, the ITCA requires a party filing a claim against a political subdivision to file notice with the governing body of that political subdivision within one hundred eighty (180) days after the loss occurs. *See* Ind. Code § 34-13-3-8. "Once a defendant raises an issue of noncompliance [with the ITCA], the burden shifts to the plaintiff to prove compliance." *Gibson*, 2021 U.S. Dist. LEXIS 81287, at *2 (citing *Brown*, 876 N.E.2d at 384). The ITCA requires "a two-step process—the filing of a claim and, if denied, the filing of a lawsuit," and courts are to

56

bar lawsuits unless "the person's claim has been denied in whole or part." *Brown*, 876 N.E.2d at 385 n.4 (citing Ind. Code § 34-13-3-13).

The City argues that CTG never filed a tort claim notice with the City concerning its Third-Party Complaint (Filing No. 241 at 54). Instead, CTG filed the Third-Party Complaint on July 3, 2023, and then, three weeks later, filed a tort claim notice concerning a separate case and claim—replevin—which CTG filed against the City and ultimately dismissed. The City contends that CTG's claim is therefore barred by the ITCA. CTG responds that its tort claim notice included "[a]ny claims asserted by the Plaintiffs against CTG in [the case before the Court]." (Filing No. 255 at 13 (quoting Filing No. 257-18 at 15). In their Reply, the City contends that the tort claim notice CTG refers to was untimely as it was filed three weeks after CTG filed its Third-Party Complaint and thus, the claim is barred (Filing No. 273 at 36 (citing Ind. Code § 34-13-3-13)).

Here, CTG's claim is not barred by the ITCA notice requirements. The plain language of the ITCA states, "[a] person may not initiate a suit against a governmental entity unless the person's claim has been denied in whole or in part." Ind. Code § 34-13-3-13. CTG does not deny that they initiated suit against the City prior to filing their tort claim notice. However, the proper remedy when a person prematurely initiates a tort action before the actual or deemed denial of their claim is to dismiss the action without prejudice. *See Bradley v. Eagle-Union Cmty. Sch. Corp. Bd. of Sch. Trs.*, 647 N.E.2d 672, 676 (Ind. Ct. App. 1995). If an Indiana trial court instead disposes of the action by entering summary judgment against a plaintiff, the Indiana Court of Appeals has instructed that they will "reverse that grant of summary judgment and remand with instructions to dismiss without prejudice[.]" *Id.*; *see also Orem v. Ivy Tech State Coll.*, 711 N.E.2d 864, 870 (Ind. Ct. App. 1999) (reversing summary judgment and remanding for dismissal without prejudice in similar circumstances); *Weaver v. Elkhart Cmty. Sch. Corp.*, 95 N.E.3d 97, 101 (Ind.

57

Ct. App. 2018) (same). Following this logic, the City is not entitled to summary judgment on this basis.

### 2. **Fault**

"Indiana law adheres to the general rule that, 'in the absence of an express contractual or statutory right to indemnity, a party may bring an action for indemnification only if he is without fault.'" *Mills v. Hausmann-Mcnally, S.C.*, No. 1:13-cv-00044, 2014 U.S. Dist. LEXIS 4409, at *15 (S.D. Ind. Jan. 14, 2014) (quoting *Mullen v. Cogdell*, 643 N.E.2d 390, 400 (Ind. Ct. App. 1994)). The City argues that CTG identifies no contract which provides for a claim against the City for contribution or indemnification (Filing No. 241 at 56). The City further contends that CTG's Third-Party Complaint is premised on it being found liable and not without fault causing its indemnification claim to fail. *Id.* (citing *Indianapolis Power & Light Co. v. Brad Snodgrass, Inc.*, 578 N.R.2d 669, 671 (Ind. 1991); *Mills*, 2014 U.S. Dist. LEXIS 4409, at *22; *Lockhart v. ExamOne World Wide, Inc.*, No. 2:11-cv-037, 2012 U.S. Dist. LEXIS 112067, at *10 (S.D. Ind. Aug. 9, 2012)).

In its Response, CTG combines its arguments for fault and contributory negligence contending that there are genuine issues of material fact concerning the alleged operational negligence of the City which preclude summary judgment (Filing No. 255 at 13). CTG argues that this alleged operational negligence was the primary, efficient or moving cause of Plaintiffs' injuries. The Court agrees with the City.

The Court does not disagree that genuine issues of material fact concerning the City's negligence in causing Plaintiffs' injuries remain—which was discussed at length above in Section A(1)(a)(ii)—but CTG has failed to show that it was without fault allowing for its indemnification claim. Indeed, CTG's claims are premised on it being found at fault and CTG fails to provide any

58

authority for the proposition that it may be indemnified even if it were at fault. Accordingly, because a party may bring an action only if he is without fault, CTG's indemnification claim fails. *Mills*, 2014 U.S. Dist. LEXIS 4409, at \*15; *see also Lockhart*, 2012 U.S. Dist. LEXIS 112067, at \*10 (same). The City's summary judgment motion is therefore **granted** for CTG's Third-Party Complaint.

### 3.  <u>Contributory Negligence</u>

"In 1986, the General Assembly altered Indiana's common law by adopting comparative fault as the general rule for negligence actions" through the Indiana Comparative Fault Act. *McSwane v. Bloomington Hosp.*, 916 N.E.2d 906, 911 (Ind. 2009). "But the Indiana Comparative Fault Act expressly excludes application to governmental entities, Ind. Code § 34-51-2-2, and thus the common law defense of contributory negligence remains applicable for governmental defendants" such as the City in this case. *Funston v. Sch. Town of Munster*, 849 N.E.2d 595, 598 (Ind. 2006). The Indiana Supreme Court then explained the following:

> Therefore, even a slight degree of negligence on the part of [the plaintiffs], if proximately contributing to his claimed damages, will operate as a total bar to the [plaintiffs'] action for damages against the [government entity], even though, as against the other non-governmental defendants any fault of [the plaintiffs] would only operate to reduce the damages he might obtain.

*Id*. Accordingly, if CTG is found to be liable in negligence, it cannot recover against the City. "The question of contributory negligence is a question of law for the court when only one reasonable inference or conclusion can be drawn from the evidence." *McSwane*, 916 N.E.2d at 911.

Here, CTG's claim states, "[t]o the extent that it is determined that [CTG] is liable to the Plaintiffs," the City is liable to CTG (Filing No. 1-2 at 71 ¶19). Consequently, there is no possibility for CTG to recover against the City in negligence because the prerequisite of its

claim—that CTG must first be found liable to the Plaintiffs—essentially mandates a finding of contributory negligence and bars any recovery against the City. This is an additional ground by which the City's summary judgment motion is **granted** as to the Third-Party Complaint.

CTG contends that even if the Court grants the City's Motion as to the Third-Party Complaint, it "maintains a critical defense under the Indiana Comparative Fault Act" because the Act permits a jury to apportion fault to a "nonparty." (Filing No. 255 at 18). CTG is mistaken. The Court need not delve into whether the City is a "nonparty," because, as explained above, the Indiana Comparative Fault Act explicitly excludes application to governmental entities—such as a city. *Funston*, 849 N.E.2d at 598 (citing Ind. Code § 34-51-2-2). Accordingly, this defense does not apply to the City.

### 4.  Indiana Tort Claims Act ("ITCA") Immunities

Lastly, the City argues that it is entitled to immunity pursuant to the immunity provisions in the ITCA. While the Court need not reach this section, as the City's Motion is granted on other grounds above, the City is not entitled to the immunities under the ITCA for the same reasons they were not entitled to the immunity provisions for Plaintiffs' claims.

### IV.    CONCLUSION

For the reasons explained in this Order, Smith's Motion for Partial Summary Judgment (Filing No. 232) on all Plaintiffs' claims and the City's crossclaims is **DENIED**. Plaintiffs' claims against Smith in his individual capacity shall proceed.

 The City's Motion for Summary Judgment (Filing No. 237) on Plaintiffs' claims and Third-Party claims is **GRANTED IN PART AND DENIED IN PART**. Summary judgment is **granted** for Count I: Strict Liability, Count III: Res Ipsa Loquitur, Count V: Trespass, and Count VI: Battery of Plaintiffs' Second Amended Class Action Complaint. These claims are **dismissed**

**with prejudice**. Summary judgment on damages is **granted** for personal injury damages which require expert testimony but **denied** for specific personal injury damages such as headaches and anxiety. Summary judgment is **denied** for Count II: Negligence and Count IV: Private Nuisance of Plaintiffs Second Amended Class Action Complaint. These claims shall proceed to trial. Summary judgment is also **GRANTED** as to the Third-Party claim against the City, filed by CTG, and this claim is **dismissed with prejudice**.

The City's Motion for Partial Summary Judgment (Filing No. 252) is **GRANTED** as to liability on its Crossclaims against Cornerstone Trading, Smith, and My-Way Trading. However, the City's imbedded request for the Court to schedule a damage hearing on the City's Crossclaims is **denied without prejudice,** subject to refiling if necessary.

This matter remains set for final pretrial conference on **July 15, 2026** and jury trial on **August 10, 2026**. The parties are directed to contact the Magistrate Judge's chambers to schedule a settlement conference and should confer on whether a damages hearing concerning the City's Crossclaims against My-Way is necessary. The claims that remain for settlement or trial are as follows:

Count II: Negligence, and Count IV: Private Nuisance of Plaintiffs' Second Amended Class Action Complaint against the City of Richmond, Indiana.

Count I: Strict Liability, Count II: Negligence, Count III: Res Ipsa Loquitur, Count IV: Private Nuisance, Count V: Trespass, Count VI: Battery, of Plaintiffs' Second Amended Class Action Complaint against Seth Smith and Cornerstone Trading Group, LLC.

Count II: Nuisance, Count III: Negligence, and Count IV: Violation of Indiana's Anti-Dumping Statute (Ind. Code § 13-30-3-13) of the City of Richmond, Indiana's Crossclaims against Seth Smith, Cornerstone Trading Group, LLC, and My-Way Trading, Inc.

**SO ORDERED**.

Date: 3/27/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

MY-WAY TRADING, INC.
c/o Seth Smith
P.O. Box 1282
308 NW F St.
Richmond, IN 47374
plasticman1@earthlink.net

Eric N Allen
Allen Wellman McNew Harvey LLP
ena@awmh.net

Andrew Ardizone
Crossen Law Firm
andrew@crossenlawfirm.com

Trevor J. Crossen
CROSSEN LAW FIRM, LLC
trevor@crossenlawfirm.com

Benjamin D. Felton
DYER GAROFALO MANN & SCHULTZ
bfelton@dgmslaw.com

Gina M. Koeneman
CROSSEN LAW FIRM LLC
gina@crossenlawfirm.com

Arie J. Lipinski
Lipinski Law
lipinski@lipinski-law.com

Corwin Scott Marcum
Allen Wellman McNew Harvey, LLP
csm@awhkc.com

Andrew M. McNeil
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
amcneil@boselaw.com

Jackson Lee Schroeder
Bose McKinney & Evans LLP
jschroeder@boselaw.com

John Smalley
Dyer, Garofalo, Mann, & Schultz
jsmalley@dgmslaw.com

Brad R. Sugarman
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
bsugarman@boselaw.com

Seth M. Thomas
BOSE MCKINNEY & EVANS, LLP (Indianapolis)
sthomas@boselaw.com

Jacob Scott Troxell
Allen Wellman Harvey Keyes Cooley, LLP
jst@awmlaw.com

Dawn Elizabeth Wellman
ALLEN WELLMAN MCNEW
dew@awmlaw.com