IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DIVISION OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TUSHAWN CRAIG and MARQUETTA STOKES, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs | ) | Civil Action No. 1:23-cv-01575-TWP-MJD |
| | ) | |
| CORNERSTONE TRADING GROUP, LLC, SETH SMITH, and CITY OF RICHMOND, INDIANA, | ) | |
| Defendants. | ) | |

**PROPOSED FINDINGS OF FACT, CONCLUSIONS OF LAW & FINAL ORDER**

This matter is before the Court for decisions on several issues left for resolution by the Court, rather than the jury, from the recent five-day jury trial. On September 18, 2026, the jury returned a verdict finding the Defendant, Cornerstone Trading Group, LLC, the Defendant, Seth Smith, and the Defendant, the City of Richmond, Indiana (hereinafter, collectively, the "Defendants"), liable for negligence and nuisance. On the negligence claim, the jury awarded a total of $5,000 each to the Plaintiff, Marquetta Stokes, and the Plaintiff, Tushawn Craig (hereinafter, collectively, the "Plaintiffs"). The jury further apportioned 30% fault to Defendant Cornerstone, 30% fault to Defendant Smith, and 40% fault to Defendant City. Dkt. 425. On the nuisance claim, the jury awarded the Plaintiffs a total of $10,000 and found $3,000 in damages from Defendant Cornerstone, $3,000 in damages from Defendant Smith, and $4,000 from Defendant City. *Id.*

Whether the City is immune from liability for the Plaintiffs' negligence and nuisance claims is a question of law for this Court to decide. *See* ECF No. 304 at 33 (citing *State v. Lucas by Nevitt*, 223 N.E.3d 253, 258 (Ind. Ct. App. 2023)). The Court has further recognized that the question "may require an extended factual development, but the essential inquiry is whether the challenged act is the type of function which the legislature intended to protect with immunity." *Id.* at 33-34 (citing *City of Indianapolis v. Duffitt*, 929 N.E.2d 231, 236 (Ind. Ct. App. 2010)); *see also Peavler v. Board of Com'rs of Monroe Cty.*, 528 N.E.2d 40, 46 (Ind. 1988). Having reviewed the evidence submitted at trial, the Court now issues its findings of fact and conclusions of law on the City's immunity defenses.

## I. FINDINGS OF FACT.

### A. The Properties at issue.

1. Defendant Smith is the sole owner and operator of Defendant Cornerstone (hereinafter, collectively the "Cornerstone Defendants"), as well as its related company, My-Way Trading, Inc. Trial Tr., vol. 3, 511:6–13.

2. The Cornerstone Defendants operated as brokers in the plastic materials industry. Trial Tr., vol. 4, 895:1–25. The Cornerstone Defendants utilized three properties in Richmond—308, 310, and 358 N.W. F Street (hereinafter, collectively the "Properties" and each individually a "Property")—to process industrial plastics into a resalable form and store the same until it could be sold. *See*, *e.g.*, Trial Tr., vol. 3, 511:14–18, *Id*. at 656:20–657:7, *Id*. at 687:13, *Id*. at vol. 4, 895:14–25.

3. Although the Cornerstone Defendants operated on all the Properties, they held title only to the 308 Property. Trial Tr., vol. 3, 511:2–5. The Cornerstone Defendants

never held a lease or owned the 310 and 358 Properties and never paid property taxes on those Properties. Trial Tr., vol. 3 659:4-662:2. The 310 and 358 Properties were owned by an entity known as "AFG Investment Fund I, LLC" ("AFG"), Trial Ex. 503, until the City acquired title to both in March of 2021. *See*, *et al*., Trial Tr., vol. 2, p. 370-71, *Id*. at vol. 3, 510:25–2, Trial Ex. 328 (quitclaim deed to City).

**B. The April, 2023, Fire and the City's response thereto.**

4. In the afternoon of April 11, 2023, a fire ignited at the 358 Property which quickly spread onto the 310 and 308 Properties (hereinafter, the "Fire"). Trial Tr., vol. 3, 510:10–15.

5. While the Fire and firefighting was ongoing, the City's Fire Chief, Tim Brown, began consulting with the Wayne County Emergency Management Agency ("EMA") on how to respond to the Fire. Trial Tr., vol. 1, 160:7–16.

6. Fire Chief Brown and EMA referred to the "Emergency Response Guidebook"—colloquially called the "5-Minute Bible"—for guidance on their response to the Fire. Trial Tr., vol. 1, 159:11–24.

7. Based on his knowledge of the Fire and the Emergency Response Guidebook at that time, Fire Chief Brown believed that it recommended that an evacuation be ordered within one half mile of the blaze. Trial Tr., vol. 1, 159:11–24 (Mr. Brown: "EMA looked up into the Guidebook … and came up with at [*sic*] the half-mile range for the evacuation"), *Id*. at 161:2–12.

8. Fire Chief Brown directed an evacuation order to be issued to all residents within a half-mile radius around the Properties (hereinafter, the "Evacuation Order").

Trial Tr., vol. 1, 126:3–6 (Mr. Brown: "I ordered an evacuation"), *Id*. at 160:7–16 (Mr. Brown: "I gave the okay [to Wayne Count Emergency Management Agency] to do the evacuation").

9. The Evacuation Order issued at 3:57 p.m. on April 11, 2026. Trial Ex. 49.

10. According to Michael Britt, then-Chief of Police and the highest ranking officer on-duty at the time, no effort to actually enforce the Evacuation Order was ever made. Trial Tr., vol. 3, 719:25–720:3.

11. Plaintiffs testified they suffered pecuniary damages and displacement costs because of the Evacuation Order. *See*, *e.g*., Trial Tr., vol. 3, 505:3–21.

12. Plaintiffs testified they suffered anxiety due to loss of use of their homes because of the Evacuation Order. *See*, *et al*., Trial Tr., vol. 2, 437:6–16, *Id*. at 454:10–13.

13. Plaintiffs do not claim to have been physically impacted by the Fire or the Evacuation Order. *See*, *et al*., Trial Tr., vol. 2, 453:20–454:2, *Id*. at vol. 3, 499:6–11.

14. The Evacuation Order remained in effect from April 11 until the afternoon of April 16, 2023. Trial Tr., vol. 2, 284:18–21.

15. The Richmond Fire Department declared the Fire "extinguished" on April 18, 2023. Trial Tr., vol. 1, 158:20–159:3

**C. The accumulation of plastic materials on the Properties by the Cornerstone Defendants alone.**

16. At the time of the Fire, the Cornerstone Defendants reported to the United States Environmental Protection Agency (EPA), under penalty of perjury, that there were 5,990,000 pounds of plastic material on the 310 and 358 Properties and 5,767,000 pounds

of plastic materials on the 308 Property. Trial Ex. 354 at 5-6. As stipulated by the parties, the Cornerstone Defendants owned all this plastic material. Trial Tr., vol. 3, 511:14–18; *see also Id*. at vol. 2, 386:2–6 (Ms. Fields: stored plastics "were the property of Mr. Smith"), *Id*. at vol. 3, 644:6–8.

17. Per Deputy Chief Douglas Gardner, the Fire required both an ignition source and a fuel source to burn. Trial Tr., vol. 2, 324:5–15. While the identity of the ignition source was unresolved, Deputy Gardner confirmed that the Cornerstone Defendant's accumulated plastic materials made up the bulk of the Fire's fuel source. *Id*. at 286:8–16, 324:16–20.

18. Since at least 2012, the Cornerstone Defendants had accumulated mass amounts of plastic materials at the Properties as part of their normal business operations. *See*, *et al*., Trial Tr., vol. 3, 690:7-11, *Id*. at vol. 4, 899:12–900:5, Trial Ex. 354 at 2 (some plastic materials at the Properties had been stored there for "up to 15 years").

19. At all relevant times, neither of the Cornerstone Defendants was a government entity, an agent of a government entity, or an employee of a government entity. *See*, *et al*., Trial Tr., vol. 3, 687:4–13 (Mr. Smith: testifying to being in the private plastics sector for "39, 40 years").

20. At no point in time did the City act as a contributor or supplier of plastic materials to the Cornerstone Defendants. Trial Ex. 354 at 2 ("Cornerstone was supplied with [plastic] materials from GM, Cummins, Subaru, Spartech, GE, Ford, Chrysler, Nestle, Avery Dennison, WM, Heritage Environmental").

21. Although the City held title to the 310 and 358 Properties from March of 2021 onward, those properties thereafter remained in the possession of the Cornerstone Defendants, whose plastics operations continued effectively uninterrupted. *See*, *e.g.*, Trial Tr., vol. 3, 634:9–12 (Mr. Smith: the Cornerstone Defendants "started [disposing of inventory on the Properties] long before the purchase of [*sic*] the City").

**D. Prior orders regarding the Properties and the Cornerstone Defendants' activities thereon.**

22. In October 2018, Indiana's Department of Homeland Security issued three orders to Defendant Smith, pertaining respectively to each of the Properties and citing various violations of Indiana's Administrative Code (hereinafter, collectively the "State Orders" and each individually a "State Order"). Trial Exs. 27-29.

23. In July 2019, the City issued three preliminary orders pertaining respectively to each of the Properties and citing violations of "Richmond Code Chapter 98 and Indiana Code 36-7-9-1 et seq." Trial Exs. 30-32. Following notice and a pair of hearings that September, the City's Unsafe Building Commission upheld the cited violations and issued final orders for each of the Properties (hereinafter, collectively the "City Orders" and each individually a "City Order"). Trial Exs. 538–540.

24. Per the City Order on the 308 Property, Defendant Cornerstone was required to either "repair or remove and vacate the unsafe structure and property" within sixty (60) days. Trial Ex. 540 at 3. Repairing the 308 Property called for, *inter alia*, removing or relocating the plastic material "accumulated on or up to the lot line of the adjacent

property to the east[,]" "stacked on three sides of the exterior[,]" and "block[ing] the bottom of the interior of stairs [*sic*][.]" *Id*. at 2–3.

25. Per the City Order on the 310 Property, AFG and/or "any Interested Parties" were required to either "repair or remove and vacate the unsafe structure and property" within sixty (60) days. Trial Ex. 539 at 2. Repairing the 310 Property called for, *inter alia*, removing or relocating the plastic material "located up against the property line[,]" "blocking interior exits … [and] exterior egress paths[,]" and "stacked against the chain link fence adjacent to the neighboring property line[.]" *Id*. at 2.

26. Per the City Order on the 358 Property, AFG and/or "any Interested Parties" were required to either "repair or remove and vacate the unsafe structure and property" within sixty (60) days. Trial Ex. 538 at 3. Repairing the 358 Property called for, *inter alia*, removing or relocating the plastic material "located on property lines[,]" "stacked at northeast and southwest corner[,]" and "block[ing] stairs … [and] access paths[,]" as well as reorganizing the plastic material within the structure's interior to create "accessible aisles[.]" *Id*. at 2.

27. The Cornerstone Defendants accepted and responded to the City Orders on the 310 and 358 Properties as "interested parties[.]" Trial Ex. 35 at 1.

28. On March 3, 2020, the Wayne Circuit Court affirmed the City Orders as neither arbitrary or capricious nor an abuse of discretion. Trial Ex. 35 at 8. The Wayne Circuit Court did not engage in a de novo review of the record and instead engaged in a review under Indiana administrative procedures. *See* Trial Ex. 35.

29. Thereafter, the City attempted but failed to enforce the State Orders and City Orders, as well as the building codes and laws cited therein, against AFG and the Cornerstone Defendants. (*See*, *et al*., Trial Ex. 326 (letter from Mr. Sickmann informing Mr. George Sowers, counsel to Cornerstone and Mr. Smith, that his clients "need[] to immediately begin the process of vacating all of the sites ... subject to the Unsafe Building Order" so that Richmond could "begin the process of remediating the health and safety violations"), Trial Tr., vol. 3, at 575:24–576:4 (The Court: "the evidence before the jury indicates that the City attempted to inspect the property it owned" but "apparently took no further action to remediate the known fire hazard and nuisance").)

30. Plaintiffs blame the City for the Fire because of the City's failure to enforce the State Orders, City Orders, and the building codes and laws cited therein. *See*, *et al*., Trial Tr., vol. 1, 147:16–19 (Mr. Brown: excess plastic materials can "[p]otentially" ignite a fire), *Id*. at vol. 2, 324:16–20 (Mr. Smalley: "And for this fire to become what it did, you needed the massive amount of petroleum plastics ..., don't you?" Mr. Gardner: "Yes").

31. Plaintiffs alleged that the Fire would not have occurred but for the City's failure to enforce the State Orders, City Orders, and the building codes and laws cited therein. *See*, *et al*., Trial Tr., vol. 2, 255:9–12 (Mr. Smalley: "[Ind. Code 36-7-9] is designed to provide a safeguard against property that would produce a harm to the community if not maintained, doesn't it?" Mr. Jordan: "Yes"), *Id*. at vol. 3, 573:15–18 (The Court: "The evidence shows that [the Cornerstone defendants] violated a litany of fire codes, which led to a fire").

32. Plaintiffs offered no expert evidence or otherwise developed any theory regarding the cause of the Fire other than the lack of enforcement of the State Orders, City Orders, and the building codes.

33. Plaintiffs submitted that the nuisance posed by the Properties continued due to the City's failure to enforce the State Orders, City Orders, and the building codes and laws cited therein. *See*, *e.g.*, Trial Ex. 35 ("The evidence presented at the Unsafe Building Hearings … clearly established that the structures … constitute a nuisance"), Trial Tr., vol. 3, at 575:24–576:4 (The Court: "the evidence before the jury indicates that the City … apparently took no further action to remediate the known fire hazard and nuisance").

34. The nuisance alleged by Plaintiffs on the Properties would have been abated had the City enforced the State Orders, City Orders, and the building codes and laws cited therein *See*, *et al*., Trial Tr., vol. 3, 576:9–20 (The Court: "Turning to the nuisance claim … the evidence admitted is legally sufficient for a jury to conclude that the City's failure to remediate the known fire hazard constitute[d] an interference with Plaintiffs' comfortable enjoyment and use of their property").

35. The State Orders, City Orders, and the building codes and laws cited therein addressed occupancy and operating a business from the Properties, but because the City took title to the 310 and 358 properties for the purpose of remediation and demolition, the occupancy requirements of the State Orders, City Orders, and the building codes and laws cited therein various orders and codes did not apply. Trial Tr., vol. 2, 255:23-257:3; Trial Ex. 346 at 2.

**E. The City's acquisition of the 310 and 358 Properties.**

36. Both the 310 and 358 Properties had been classified as "Brownfields" by the EPA in 2018, under the definitions set forth in Section 104(k) of the Comprehensive Environmental Response, Compensation, and Liability Relief Act (CERCLA). Trial Ex. 331, Trial Tr., vol. 2, 403:1–4 (Ms. Fields: "we [the City] were awarded the [Brownfields] funds in 2018"), *Id*. at vol. 4, 759:1–4 (Mr. Pigg: the City was "awarded their [Brownfields assessment] grant in 2018").

37. The City took title to the 310 and 358 Properties in March of 2021 expressly to investigate the potential presence of contamination thereon, including by performing the assessments for which the City received a Brownfields grant from the EPA, and to remediate any contamination which that investigation uncovered. Trial Tr., vol. 2, 371:22–24 (Ms. Fields: the City's purpose was "[r]emediation and demolition"); *see Id*. at vol. 4, 759:16–19 (Mr. Pigg: "[The City] took title to the propert[ies] in March of 2021, and shortly after ... they began the process of trying to get access to the property to perform the [Brownfields] assessment").

38. The process to fully remediate a Brownfield under CERCLA typically takes around ten years. Trial Tr., vol. 4, 753:20–24. Of that time, performing the initial assessments and investigations—the stage for which the City received its grant—typically takes one (1) to one-and-a-half (1½) years to complete. *Id*. at 754:11–13.

39. Due to circumstances outside the City's control, the Brownfields investigation and assessment was delayed. These circumstances included "technical issues" with the United States Department of the Treasury's Automated Standard Application for

Payment system (ASAP), *see*, *et al*., Trial Ex. 338 at 9–12 (description of ASAP issues by TRC), Trial Tr., vol. 4, 757:24–758:3, as well as interference by Defendant Smith and Defendant Cornerstone with the City's attempts to access to its Properties. *See*, *et al*., *Id*. at 776:13–16 (Mr. Pigg: "The [City's] inability to fully assess the 310/358 property due to Cornerstone's actions inhibited … additional EPA grant-funded environmental assessments"), *Id*. at vol. 2, 345:25–346:4 (Ms. Fields: the City was "unable to access the site to do [Brownfields] work" because "Mr. Smith did not give [the City] free access"), Trial Ex. 338 at 13 (TRC citing "access issues/safety concerns" as contributors to "Costs Overruns" and "[p]rolonged periods of time [spent] executing the Phase I [assessments]").

40. In December of 2022, the City submitted a *Final Technical Report* to the EPA outlining the limited assessment which had been conducted under the 2018 grant. Trial Ex. 338, Trial Tr., vol. 2, 346:19–21. At the time of the Fire, the City was still awaiting a response from the EPA. *Id*. at 347:20–348:1 (Ms. Fields "We did not get closure on our Brownfield grant from the EPA until after the fire" and "[t]he Brownfield grant didn't terminate until we got the closeout letter from the EPA, which was after the fire"), Trial Ex. 340 (EPA response, sent April 20, 2023).

41. But for its acts to investigate and remediate the Brownfields at the 310 and 358 Properties, the City would have neither obtained title to them in March of 2021 nor continued to hold that title through April of 2023. Trial Tr., vol. 2, 371:22–24 (Ms. Fields: the City's goal for the 310/358 Properties was "[r]emediation and demolition").

**F. The City's decisions as to the accumulated plastic materials and the Cornerstone Defendant's operations on the City-owned Properties.**

42. As early as October of 2020, the City had demanded that the Cornerstone Defendants vacate the Properties and remove all plastic materials they had accumulated thereon. Trial Ex. 326.

43. After taking title to the 310 and 358 Properties in March of 2021, City officials considered whether the City should "take over [those Properties] and absorb the cost of removing the plastic material" accumulated by the Cornerstone Defendants there. Trial Tr., vol. 3, 590:16–20; *see Id*. at vol. 4, 859:15–860:5 (Mr. Sickmann: "people [with the City] were trying to estimate" the cost of unilateral removal).

44. The government resources of the City are scarce and strictly budgeted. Trial Tr., vol. 3, 581:14–582:2 (Mr. Snow: the City "ha[s] to develop a budget each year" and "can't raise [its] revenue easily"). Once the City's annual budget has been adopted, new funds cannot be readily generated and funds allocated toward one expense cannot be easily re-allocated to another. *Id.* at 587:3–9.

45. Even after the City received title to two of the Properties, Defendant Smith explicitly communicated that any attempt by the City to unilaterally take possession of or remove the plastic material therein would be met with litigation. Trial Ex. 329 at 2 ("My client directly informed the City Representative ... that the baled plastic was his business property and if they took possession of it he would sue them"), Trial Tr., vol. 3, 675:12–16 (Mr. Smith: "I told [the City] I did not want to have to sue them over this issue, I was moving [the plastic]").

46. At all relevant times, the City had allocated an annual budget of $15,000 for "litigation matters[.]" Trial Tr., vol. 4, 789:10–791:9. Litigation with the Cornerstone Defendants over the seizure and removal of plastic materials from the City-owned Properties could not be funded by this very limited budget. *See Id*. at vol. 4, 789:12–15 (Mr. Sickmann: "…in situations in which [insurance defense] coverage is not available, I would handle [litigation on behalf of the City] directly").

47. City officials further believed that unilaterally removing Defendant Smith's plastic materials from the Properties would have necessitated storage and disposal functions for which the City lacked practical and technical capabilities and would have been a government seizure of private business assets. Trial Tr., vol. 3, 590:16-591:12, 598:17-22. City officials estimated that the total public cost of such an undertaking would likely have been "in seven figures[.]" *Id.* at 590:25–591:7.

48. At all relevant times, no part of the City's budget was ever allocated for the removal of Defendant Smith's plastic materials from the City-owned Properties. Trial Tr., vol. 2, 390:7–9 (Ms. Fields: "Zero" dollars budgeted between 2021 and 2023). Moreover, though the City received a Phase I Brownfields grant from the EPA, no part thereof could be used to remove Defendant Smith's plastic materials. *Id*. at 344:10–12, 390:10–12.

49. Under these circumstances, City officials acting in their official capacity concluded that unilateral removal of Defendant Smith's plastic materials was "not feasible" given the City's financial constraints, competing priorities, and the need to prudently allocate scarce resources, and so made the decision to forego any such removal efforts. Trial Tr., vol. 3, 591:8–12.

## II. CONCLUSIONS OF LAW.

### A. General Conclusions of Law

1. The City meets the definition of a "[g]overnment entity" adopted for Title 34 of the Indiana Code. Ind. Code § 34-6-2.1-77 ("'Government entity', for purposes of … IC 34-13-3 … means the state or a political subdivision of the state").

2. This cause represents "a claim or suit in tort" and is therefore subject to the Indiana Tort Claims Act (ITCA), Ind. Code §§ 34-13-3-0.1 *et seq*. *Id*. § 34-13-3-1(a).

### B. The City cannot be liable for damages resulting from the Evacuation Order.

3. Plaintiffs allege that the City, by issuing the Evacuation Order, inflicted injury upon them in the form of pecuniary damages, monetary displacement expenses, temporary loss of use of property, and alleged emotional distress (hereinafter, collectively the "Evacuation Damages"). *See*, *et al*., Trial Tr., vol. 3, 505:3–21, *Id*. at vol. 2, 437:6–16, *Id*. at 454:10–13.

4. The Plaintiffs' damages stem entirely from the issuance of the Evacuation Order and the resulting evacuation, and neither Plaintiff alleges to have suffered physical injury or damage to their property from the Fire. *See*, *et al*., Trial Tr., vol. 2, 453:23–24, *Id*. at vol. 3, 492:17–21.

5. Section 3, subpart (a)(7) of the ITCA, Ind. Code § 34-13-3-3(a)(7), provides that a governmental entity is not liable if a loss results from the "performance of a discretionary function." *Id*.

6. The Indiana Court of Appeals found as follows in the case of *Leo Mach. & Tool, Inc. v. Poe Volunteer Fire Dep't, Inc.*, 936 N.E.2d 855 (Ind. Ct. App. 2010), in regard to discretionary function immunity during a fire:

> …most, if not all, of the actions undertaken and decisions made by fire departments *during the course of actually fighting a fire* involve allocation of resources, the balancing of risks and benefits, and cannot adequately be reviewed by resort to traditional tort standards. Such decisions thus exemplify exercises of the policy-formulation discretion which is shielded by [discretionary function] immunity under [the ITCA].

*Id*. at 861, *aff'd on reh'g*, 940 N.E.2d 384 (Ind. Ct. App. 2011) (quoting *Willis v. Warren Tp. Fire Dept.*, 650 N.E.2d 321, 325–26 (Ind. Ct. App. 1995)) (emphasis in original).

7. The *Leo* Court found that the government entity in that case—a fire department in Fort Wayne—had formed and enacted a fire response strategy "after a conscious and informed risk/benefit analysis based upon the specific challenges and threats caused by th[e] particular fire" to which they were responding. *Leo*, 936 N.E.2d at 862. The fire department's actions as part of that strategy were therefore "entitled to immunity" as discretionary functions under the ITCA. *Id*. While that Court noted that the fire department's allegedly tortious action might have created liability if not performed while "firefighting efforts were still on-going[,]" *Id.*, it upheld their immunity after the claimants "failed to designate any evidence establishing that the fire was extinguished" prior to the action in question. *Id*.

8. Fire Chief Brown ordered the Evacuation after consultation with the EMA, consistent with the Emergency Response Guidebook. *See*, *et al*., Trial Tr., vol. 1, 159:11–24, *Id*. at 161:2–12. Moreover, the breadth of the Evacuation Order—all residents within a

half-mile radius around the Properties—was based on the specific characteristics of the Fire as involving "unknown substances[.]" *Id*. at 159:17–24. The City therefore satisfied the standard set in *Leo* for "a conscious and informed risk/benefit analysis based upon the specific challenges and threats caused by [the Fire]." *Leo*, 936 N.E.2d at 862.

9. Additionally, the action complained of by Plaintiffs—the imposition of the Evacuation Order—occurred while "firefighting efforts were still on-going." *Leo*, 936 N.E.2d at 861. Evidence at trial established that the Evacuation Order was in effect until the afternoon of April 16, 2023, Trial Tr., vol. 2, 284:18–21, and the Fire Department did not declare the Fire "extinguished" until April 18, 2023. *Id*. at vol. 1, 158:20–159:3. Plaintiffs, like those in *Leo*, therefore cannot "establish[] that the fire was extinguished" prior to their alleged Evacuation Order damages. *Leo*, 936 N.E.2d at 862.

10. Based on the facts proven at trial, the City is immune from liability for any of Plaintiffs' Evacuation Damages under the ITCA. Ind. Code § 34-13-3-3(a)(7).

11. In addition to implicating discretionary function immunity under the ITCA, the firefighting activities of local governments have also been extended "sovereign immunity" under Indiana common law. *See Veolia Water Indianapolis, LLC v. Nat'l Tr. Ins. Co.*, 3 N.E.3d 1, 7-8 (Ind. 2014).

12. Common law sovereign immunity covers a wide range of activities falling under the umbrella of "fire protection" which might otherwise create liability. *Veolia Water*, 3 N.E.3d at 7-8. In over one hundred (100) years of jurisprudence on the subject, local governments have been excused from liability for, *inter alia*, their negligent failure to extinguish a fire, *see Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1204–5 (Ind. Ct. App. 2011),

negligent failure to supply enough water for firefighting, *see Veolia Water*, 3 N.E.3d at 7-8, *Gates v. Town of Chandler, Water Dep't*, 725 N.E.2d 117, 119–20 (Ind. Ct. App. 2000), negligent operation of a fire engine, *see Louisville & S. Indiana Traction Co. v. Jennings*, 73 Ind. App. 69, 123 N.E. 835, 836–37 (1919) (excusing local government from liability for a crash caused by public servant driving a horse-drawn engine "at a high and dangerous rate … of 15 miles an hour"), negligent failure to maintain firefighting equipment and field competently trained firefighters, *see Lamb v. City of Bloomington*, 741 N.E.2d 436, 441–42 (Ind. Ct. App. 2001), *Robinson v. City of Evansville*, 87 Ind. 334, 335–37 (1882), and even allegedly negligent firefighting methods and strategy. *See Bloomington*, 741 N.E.2d at 441–42 (dismissing claim of "negligent failure to seek mutual aid/assistance" from other fire departments), *City of Peru v. Lewis*, 950 N.E.2d 1, 6 (Ind. Ct. App. 2011) (concluding sovereign immunity insulated local government from claim it negligently failed to "mak[e] a search for fire victims a priority" while firefighting).

13. Indiana courts recognize sovereign immunity for fire protection activities as a practical necessity, as there is "virtually no limit to the types of claims that citizens might advance concerning municipal inadequacies in providing adequate fire protection[.]" *Peru*, 950 N.E.2d at 6.

14. Here, the Fire Chief's decision to issue the Evacuation Order was an act of "fire protection" taken "during the course of fighting a fire[.]" *Martinsville*, 940 N.E.2d at 1204–5. The evidence presented at trial established that Fire Chief Brown directed the Evacuation Order to be issued after the Fire had started and before it had been extinguished. Trial Tr., vol. 3, 510:10–13 (Fire began "on April 11, 2023 at approximately 2:40

p.m."), Trial Ex. 49 (Evacuation Order issued on or about 3:57 p.m. on April 11, 2026), Trial Tr., vol. 1, 158:20–159:3 (Fire declared extinguished on April 18, 2023).

15. Even if the City's issuance of the Evacuation Order were not subject to discretionary function immunity under the ITCA, it nevertheless remains subject to common law sovereign immunity. Simply put, the City cannot be held liable for Plaintiffs' Evacuation Damages.

**C. The City cannot be liable for its failure to enforce the Richmond Code and the Indiana Code against the Cornerstone Defendants.**

16. Section 3, subpart (a)(8) of the ITCA, Indiana Code § 34-13-3-3(a)(8), grants governmental entities immunity from liability for, *inter alia*, their "failure to … enforce a law (including rules and regulations)." *Id*. For the purposes of this immunity, an act is considered an "enforcement"—and thus non-performance of that act considered a 'failure to enforce'—if it involves "a governmental entity or its employees compel[ling] or attempt[ing] to compel the obedience of another to laws, rules or regulations, or sanction or attempt to sanction a violation thereof." *See Mullin v. Mun. City of S. Bend*, 639 N.E.2d 278, 283 (Ind. 1994).

17. The seminal case on enforcement (or non-enforcement) immunity is *Davis v. Animal Control--City of Evansville*, 948 N.E.2d 1161 (Ind. 2011), in which the Indiana Supreme Court reviewed a tort action brought against a local animal control department accused of having negligently ignored "several" reports about a "very vicious dog[,]" including one alleging the dog had bitten a child. *Id*. at 1163. Per an "Animal Control Ordinance" from the city, the department had the authority to "declar[e] [the dog]

dangerous" unilaterally, in which case "precautionary measures" could have been imposed. *Id*. at 1165. The department took no such action and, months after the reports, the dog in question attacked and seriously injured a six-year-old child. *Id*. at 1162.

18. The plaintiff in *Davis*—the child whom the dog attacked—argued that the department and, by extension, the local government could have prevented his injuries had it enforced the Animal Control Ordinance and declared the dog dangerous, and that its failure to do so made it liable for those injuries. *Davis*, 948 N.E.2d at 1162–65. The Supreme Court disagreed, finding instead that "each of [the Animal Control Ordinance] procedures constitutes an 'activit[y] in which a governmental entity or its employees compel or attempt to compel the obedience of another to laws, rules or regulations.'" *Id*. at 1165. On this basis, the Supreme Court held the department and the city immune from liability under the ITCA. *Id*.

19. While *Davis* exemplifies non-enforcement immunity for a city's lack of proactive conduct, this immunity also applies when a local government is aware of illegal activity but refuses to react. In *Boyle v. Anderson Fire Fighters Ass'n Loc. 1262, AFL-CIO*, 497 N.E.2d 1073 (Ind. Ct. App. 1986), for example, the Indiana Court of Appeals cited non-enforcement immunity to excuse a local government from liability for its "fail[ure] to take action to end" an illegal strike by its firefighters which, due to the resulting lack of manpower, allowed a fire to spread and destroy property. *Id*. at 1075-1076, 1078.

20. Plaintiffs here, like that in *Davis*, allege that the City—having long known of the State Orders, City Orders, and violations enumerated therein—had the authority and incentive to take "precautionary measures" against the accumulated plastic materials

on the Properties, *Davis*, 948 N.E.2d at 1162, including by ejecting the Cornerstone Defendants, if need be. *See*, *et al*., Trial Tr., vol. 4, 853:14-19, *Id*. at vol. 5, 963:11-12 (The Court: "There was evidence that the City could have stopped the nuisance").

21. Further, Plaintiffs here, like that in *Boyle*, allege that the City was aware of illegal activity taking place on the Property but "fail[ed] to take prompt legal action" to end it, *Boyle*, 497 N.E.2d at 1078, instead letting the activity continue until the Fire. Per Plaintiffs themselves, the City's liability for negligence and nuisance stem from its inaction regarding the Cornerstone Defendants' accumulation of plastic materials despite knowing of its illegality. Whether or not this inaction was wise or justified is immaterial; it was a failure by the City to enforce the law, and it therefore cannot create liability per the ITCA. Ind. Code § 34-13-3-3(a)(8).

**D. The City cannot be liable for exercising its discretion in its approach to the Cornerstone Defendants' plastic materials at the 310 and 358 Properties.**

22. In addition to implicating non-enforcement immunity under Section 3, subpart (a)(8) of the ITCA, the City's inaction toward the Properties and the accumulated plastic materials thereon is also subject to discretionary function immunity under subpart (a)(7) of the same section. Ind. Code § 34-13-3-3(a)(7). Generally, a government decision is considered a discretionary function and immune from creating liability if it is "made at a planning level, as opposed to an operational level." *City of Terre Haute v. Pairsh*, 883 N.E.2d 1203, 1206 (Ind. Ct. App. 2008) (quoting *City of Crown Point v. Rutherford*, 640 N.E.2d 750, 752 (Ind. Ct. App. 1994), *reh'g denied, trans. denied*). With an alleged omission or failure to act, the government in question may establish discretionary immunity with

"evidence showing that [it] considered improvements of the general type alleged [by Plaintiffs]." *Duffitt*, 929 N.E.2d at 242.

23. Indiana courts have recognized a wide swath of government decision-making as "planning activities" and, therefore, discretionary functions, including "the exercise of official judgment and discretion, the weighing of alternatives, an assessment of competing priorities, the weighing of budgetary considerations, and the allocation of scarce resources[.]" *Pairsh*, 883 N.E.2d at 1208. A single act or omission can potentially be the end result of many levels of discretionary decision-making: a city might be held immune for its failure to repair a defective and injurious sidewalk, for example, based on budgetary decisions at the city level, *see Duffitt*, 929 N.E.2d at 234–39 (holding city immune based on "designated evidence that … limited funds [budgeted] for sidewalk repair" meant some sidewalks were repaired while others were not), decisions at the executive level on how to use allocated funds, *see Rutherford*, 640 N.E.2d 750 at 754–55 (upholding discretionary immunity for mayor's decision-making regarding federally funded "sidewalk rehabilitation program"), and even decisions at the department level made by individual managers. *See Pairsh*, 883 N.E.2d at 1208 ("a municipality can[] delegate policy decisions to department managers"), *Duffitt*, 929 N.E.2d at 239 (sidewalk repair decisions by individual managers were "based upon cost-benefit analyses and budgetary considerations" and therefore "were policy decisions in nature").

24. Here, evidence presented at trial established that City officials had weighed whether to unilaterally remove the plastic materials accumulated on the Properties by the Cornerstone Defendants. *See*, *et al.*, Trial Tr., vol. 4, 859:15–860:5 (Mr. Sickmann:

"people [with the City] were trying to estimate" the cost of unilateral removal). However, City officials ultimately determined that such an action was "not feasible" given the likely high cost and other, more pressing priorities. *Id*. at vol. 3, 591:8–12. City officials were further concerned about the need to store and dispose of the plastic material, and most importantly, did not want to involve the government in the seizure of private business assets. *Id*. at 590:16-591:12, 598:17-22.

25. Evidence presented at trial further established that the City's resources are and were scarce and strictly budgeted, *see* Trial Tr., vol. 3, 581:14–582:2, and that the City made the decision to not budget any money toward unilaterally removing the Cornerstone Defendant's plastic materials from 2021 to 2023, despite having known about the condition of the Properties for several years prior. *Id*. at vol. 2, 390:7–9. In fact, City officials projected the total public cost of such an undertaking would likely have been "in seven figures[.]" *Id.* at 590:25–591:7.

26. The City met its burden of demonstrating that it "considered improvements of the general type alleged in the [Plaintiffs'] complaint[,]" *Duffitt*, 929 N.E.2d at 242, namely the unilateral removal of the Cornerstone Defendants' plastic materials from the Properties. *See*, *et al*., Trial Tr., vol. 4, 859:15–860:5, *Id*. at vol. 3, 591:8–12, *Id*. at vol. 2, 390:7–9. The City's decision was not one made arbitrarily or as part of an "informal … program" which could be classified as "operational[.]" *Town of Highland v. Zerkel*, 659 N.E.2d 1113, 1118–19 (Ind. Ct. App. 1995). As such, the City may not be "second-guess[sed]" with the benefit of hindsight and saddled with liability after a *post hoc* analysis determines it should have taken a different path. *Rutherford*, 640 N.E.2d 750 at 755.

27. In light of the evidentiary showings made at trial and the pertinent case law on the subject, the City is entitled to discretionary immunity under the ITCA for all damages alleged by Plaintiffs to have arisen out of its failure to proactively remove the Cornerstone Defendants' plastic materials from the Properties. Ind. Code § 34-13-3-3(a)(8). No "persuasive reasons" exists for which this Court should depart from Indiana's well-settled case law on this important immunity. *Green Plains Trade Grp., LLC v. Archer Daniels Midland Co.*, 90 F.4th 919, 928 (7th Cir. 2024) (emphasis in original).

**E. The City cannot be liable for acts taken toward performing a Brownfields investigation of the Properties pursuant to CERCLA, including its act of taking and holding title to the 310 and 358 Properties.**

28. Section 3, subpart (a)(22) of the ITCA, Indiana Code § 34-13-3-3(a)(22), a government entity is immune from liability for "an act taken to investigate or remediate hazardous substances, petroleum, or other pollutants associated with a brownfield[.]" *Id.*

29. A "brownfield" is land that is abandoned, inactive, or may not be operated at its appropriate use and on which expansion, redevelopment, or reuse is complicated "because of the presence or potential presence of a hazardous substance, a contaminant, petroleum, or a petroleum product that poses a risk to human health and the environment." Ind. Code § 13-11-2-19.3.

30. Indiana's Legislature created the Indiana Brownfields Program in 2005, Pub. L. No. 235-2005, and the Indiana Finance Authority (who manages the program) explained: "Fear of liability is one of the many challenges associated with brownfield

redevelopment." Brownfields FAQ, available at https://www.in.gov/ifa/brownfields/brownfield-faqs/ (last accessed October 9, 2026).

31. The creation of immunity for investigating or remediating a brownfield was a continuation of Indiana's efforts to rescue, redevelop, and encourage brownfield remediation. *Cooper Indus., LLC v. City of S. Bend*, 899 N.E.2d 1274, 1280-1281 (Ind. 2009) (discussing "Brownfield Revitalization Zone Tax Abatement—Environmental Revolving Loan Program" bill).

32. Because the City's liability flows from it taking title to the 310 and 358 Properties for the purpose of investigating these brownfields, and the brownfield investigation and remediation process was ongoing at the time of the Fire, the City is immune from liability under Indiana Code § 34-13-3-3(a)(22).

33. If brownfield immunity applied only when liability arose from actively sampling or remediating the property, then brownfield immunity would be so narrow that it would be difficult to imagine a scenario where it would apply.

34. This would discourage government entities from taking title to brownfields to investigate, and potentially remediate, them in direct contravention to the Indiana General Assembly's promulgation of laws to encourage this practice. Ind. Code § 34-13-3-3(a)(22); *Cooper Indus.*, 899 N.E.2d at 1280-1281.

35. In turn, this would result in land across Indiana continuing to be abandoned, inactive, or not operating at its appropriate use—an objectively bad public policy result that Indiana's legislature has expressly sought to avoid.

36. Thus, the City is immune from Plaintiff's negligence and private nuisance claims as a matter of law, per Section 3, subpart (a)(22) of the ITCA. Ind. Code § 34-13-3-3(a)(22).

**E. The City cannot be liable to Plaintiffs for the private nuisance on the Properties, if any, because it did not play any part in the creation of any such a nuisance.**

37. Section 3, subpart (a)(10) of the ITCA, Indiana Code § 34-13-3-3(a)(10), grants governmental entities immunity from liability for "act[s] or omission[s] of anyone other than the governmental entity or the governmental entity's employee." *Id*. This immunity applies to prevent governmental liability when the "conduct of 'someone other than the government entity [or] employee' … encompass[es] or directly relate[s] to the acts or omissions upon which the plaintiffs are basing the[ir] claim" against the government. *Hinshaw v. Bd. of Comm'rs of Jay Cnty*., 611 N.E.2d 637, 641 (Ind. 1993).

38. Leading cases on non-governmental third-party immunity under the ITCA identify the types of acts and omissions which do and do not qualify for the immunity. In *King v. Northeast Security, Inc.*, for example, the Indiana Supreme Court declined to extend the immunity to a school district as a matter of law when the plaintiff alleged he was beaten up in the parking lot of his high school because, in part, the district employee who normally would have monitored the lot "was absent the day of [the] incident and [the district] did not find a replacement." 790 N.E.2d 474, 481 (Ind. 2003). However, the Indiana Court of Appeals, in the case of *Bartholomew County v. Johnson*, found a county government immune from a claim that it had negligently designed a bridge on the

grounds that the bridge was actually designed and built by an independent construction firm with whom the county had contracted. 995 N.E.2d 666, 678 (Ind. Ct. App. 2013).

39. At trial, the Plaintiffs represented to the Court that their private nuisance claim arose out of "the accumulation of plastic, the code violations, [and] the fire hazards" on the Properties. Trial Tr., vol. 3, 528:15–19. The Court, following this reasoning, found that "the evidence admitted is legally sufficient for a jury to conclude that the City's failure to remediate the known fire hazard constitute[d] an interference with the plaintiffs' comfortable enjoyment and use of their property." *Id*. at 576:9–13.

40. From the immunity standpoint, however, if there is immunity there is no liability even if the condition on the 310 and 358 Properties created a nuisance as Plaintiffs seek tort damages from the nuisance. *See VanHawk v. Town of Culver*, 137 N.E.3d 258, 268 (Ind. 2019). The evidence presented at trial plainly established that the acts of the Cornerstone Defendants alone "encompass[ed] or directly relate[d] to" the accumulation of plastic materials on the Property. *Hinshaw*, 611 N.E.2d at 641. There was no showing that the City contributed or supplied plastic materials to the Properties, nor that the Cornerstone Defendants accumulated those materials at the City's direction or behest; in fact, the opposite was shown. *See*, *et al*., Trial Ex. 354 at 2 (Defendant Smith to EPA: "Cornerstone was supplied with [plastic] materials from GM, Cummins, Subaru, Spartech, GE, Ford, Chrysler, Nestle, Avery Dennison, WM, Heritage Environmental"), Trial Tr., vol. 3, 511:14–18 (parties stipulated that "[Defendant Cornerstone] owned the plastic materials"). And the various building and state codes cited in the various enforcement orders

did not apply to the City's use of the 310 and 358 Properties, which remediation and demolition. Trial Tr., vol. 2, 255:23-257:3, Trial Ex. 346.

41. To the extent that the Plaintiffs base their claim of the City's nuisance liability on an alleged failure to remedy "the accumulation of plastic, the code violations, [and] the fire hazards" on the Properties, Trial Tr., vol. 3, 528:15–19, Indiana law has long held that no one—not even government entities—bears an affirmative duty to abate a nuisance created, contributed to, and maintained by another. *See*, *et al.*, *Faulkner v. City of Aurora*, 85 Ind. 130, 135 (1882) (finding city government had no duty to abate the nuisance posed by "large crowds … engag[ing] in the sport of sliding and coasting down" the city's frozen streets, which injured plaintiff's son); *see also Town of Rome City v. King*, 450 N.E.2d 72, 77 (Ind. Ct. App. 1983) (finding that a city government's "construction and operation of the sewage pumping station create[d] a nuisance" which the city thereafter had a duty to abate). As provided by our Supreme Court in *Faulkner*: liability for a nuisance lay with the parties "who were engaged in the unlawful sport which resulted in injury to the [plaintiff]," not with the government for failing to "prevent or abate the nuisance[.]" *Faulkner*, 85 Ind. at 135–36.

42. Here, the Cornerstone Defendants alone created the nuisance, and the City was not obligated to abate that nuisance. For these reasons, the City is immune from liability for the nuisance alleged by the Plaintiffs, per Section 3, subpart (a)(10) of the ITCA. Ind. Code § 34-13-3-3(a)(10).

## Conclusion

Because the City is immune from Plaintiffs' claims as a matter of law, the Court vacates the jury award against the City of Richmond, Indiana and enters judgment in favor of the City. *See Rutherford*, 640 N.E.2d at 755 (vacating jury award, reversing judgment of trial court, and concluding that discretionary function immunity applied).

**SO ORDERED.**

Date: ____________________

______________________________
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution: All counsel of record.