**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| TUSHAWN CRAIG and<br>MARQUETTA STOKES<br><br>Plaintiffs,<br><br>vs.<br><br>CORNERSTONE TRADING GROUP, LLC,<br>SETH SMITH; and<br>CITY OF RICHMOND, INDIANA,<br>Defendants. | ) | Civil Action No. 1:23-cv-01575-TWP-MJD |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The City seeks post-trial judgment on immunity grounds by characterizing Plaintiffs' claims as challenges to the evacuation order and the City's brownfields work. Plaintiffs' claims concern the City's own failure, as owner of the 310 and 358 properties, to address a known fire hazard before the fire. This Court stated that the evidence showed that the City was "fully aware" of the plastics and fire hazard on property it owned, that its failure to remediate contributed to the large-scale fire and the Plaintiffs' five-day evacuation, and that the evidence was legally sufficient for the jury to find negligence and nuisance.[1]

## I. FINDINGS OF FACT

### A. The Properties, the Plastics, and the Fire Hazard.

1. At the time of the fire, 308, 310, and 358 N.W. F Street comprised approximately 13.8 acres. The 310 and 358 parcels comprised 11.39 acres; the 308 parcel comprised 2.93 acres. The former Hoffco warehouse at 358 contained approximately 215,756 square feet, and the buildings on the site totaled approximately 224,280 square feet.[2]
2. The City acquired title to 310 and 358 in March 2021. Cornerstone acquired title to 308 in December 2018. At the time of the fire, Cornerstone owned the plastic materials stored on all three parcels.[3]
3. The City's stated purpose for taking title to 310 and 358 was "remediation and demolition."[4]

[1] Trial Tr., vol. 3, 576:5–24.
[2] Trial Tr., vol. 3, 510:10–24 ("Altogether, 308, 310, and 358 NW F Street consisted of approximately 13.8 acres"; "310 and 358 NW F Street consists of 11.39 acres"; "308 NW F Street consisted of 2.93 acres.").
[3] Trial Tr., vol. 3, 510:25–5:11:18: ("The City of Richmond took title to 310 and 358 on March 22 of 2021"; "Cornerstone Trading Group, LLC owned the plastic materials that were stored or located on 308, 310, and 358 NW F Street.").
[4] Trial Tr., vol. 2, 371:18–24 (Fields: "What were your purposes for the 310/358 properties at the time that you took title in March of 2021?" "Remediation and demolition.").

4. This Court found no evidence that Smith was a tenant or had permission to occupy the City's properties, or that the City had transferred its ownership and control to him.[5]

5. The parties stipulated that Cornerstone owned the plastics on the properties, subject to a bank security interest.[6]

6. Smith testified that he had worked in the plastics business for approximately 39 or 40 years and began processing plastic at 308 in 2006.[7]

7. Smith described the scale of the inventory as approximately 100 truckloads sold per month and an estimated 250 truckloads on the properties, which he described as about two months' inventory.[8]

8. Smith acknowledged that plastic was stored inside the 358 building before its sprinkler system was repaired and that the sprinkler system was never repaired.[9]

9. Fire Chief Brown agreed that fire code violations were fire hazards and that, for example, plastic materials located on a property line could potentially constitute a fire hazard.[10]

---

[5] Trial Tr., vol. 3, 575:18–25 ("There is no evidence that Mr. Smith was paying the City to lease the property, he was not a tenant, or even that Mr. Smith had permission to be on the property. Thus, there is no evidence that the City transferred its ownership and control of 358 or 310 properties or intended to transfer control to Smith.").

[6] Trial Tr., vol. 3, 511:14–18 ("At the time of the fire on April 11, 2023, Cornerstone Trading Group, LLC owned the plastic materials that were stored or located on 308, 310, and 358 NW F Street, subject to the First Bank of Richmond's collateral or security interest in the plastic materials.").

[7] Trial Tr., vol. 3, 687:4–16 ("[I]n April of 2023" he had "40 years, 39, 40 years" of experience; "2006 is when I started processing plastic at 308.").

[8] Trial Tr., vol. 4, 895:19–25 ("At the time … of this incident … we moved about 100 truckloads a month. There was, theoretically, estimately, about 250 on the property, so that was about two months' worth of inventory.").

[9] Trial Tr., vol. 3, 690:19–22 ("You started storing plastic materials inside the building before you repaired the sprinkler system, right? Because the sprinkler system was never repaired, right?" "Yes. That's a fact.").

[10] Trial Tr., vol. 1, 147:8–19 ("So if you have plastic materials on the property line, is that the same thing as having an ignition source, fuel, and oxygen?" "Potentially, yes.").

10. This Court found that, before the fire, the City was "fully aware of the accumulation of plastics and the fire hazard on the properties that it owned."[11]

11. The fire was reported at approximately 2:40 p.m. on April 11, 2023, in or around a semi-trailer at the east loading dock of the 358 warehouse. It spread into the warehouse and onto the 310 and 308 properties.[12]

12. Deputy Chief Gardner testified that the fire required fuel and that the massive amount of plastics from 358 across 310 to 308 was necessary for the fire to become what it did, regardless of the ignition source.[13]

13. The evidence identified the stored plastics as the fuel that enabled the fire to spread and reach its scale. Gardner testified that "you needed the massive amount of petroleum plastics" for the fire to become what it did.[14]

14. During the fire, Brown agreed to a community evacuation after consultation with the county emergency-management deputy director.[15]

**B. <u>The City's Ownership, Access, and Response Before the Fire.</u>**

15. The City was involved in what was referred to as Phase I of a Brownfields assessment to determine whether there was a recognized condition to allow the City access to EPA clean

---

[11] Trial Tr., vol. 3, 576:13–16.

[12] Trial Tr., vol. 3, 510:10–16: ("[A] fire was reported in or around the semi-trailer located at a loading dock on the east side of the warehouse at 358 NW F Street"; "The fire spread into the warehouse … and to the properties of 310 and 308 NW F Street.")

[13] Trial Tr., vol. 2, 324:5–20: ("You need fuel for every fire"; "And for this fire to become what it did, you needed the massive amount of petroleum plastics … from 358 all the way across to 308, regardless of whether it was a hot forklift or a cigarette butt, don't you?"; "Yes.").

[14] Trial Tr., vol. 2, 324:16–20.

[15] Trial Tr., vol. 1, 125:21–126:6, 21–25 ("[T]he smoke got to the point where we couldn't see the hand in front of our face, so I ordered an evacuation"; "the deputy director of EMA met with me and asked if we would want to do an evacuation, and I said yes.").

up funds. Fields testified and that no EPA-grant funds could be used to clean up the accumulation of plastic.[16]

16. Fields testified that the City had only limited access to the site and that Smith did not give the City free access to the entire site. She also acknowledged that she did not try to take a police officer with her to obtain access to the City's property.[17]

17. Fields testified that the TRC assessment was incomplete and that the City submitted its closure in December 2022.[18]

18. The City's expert, Mr. Pigg, described that the City never completed Phase I of the Brownfield assessment with nothing in his report to show that the City returned to the site after August 2021 and before the grant period closed in August 2022.[19]

19. Sickmann could not recall any City emails or attempts to return to the properties after August 5, 2021, before the fire, and did not know of any 2022 assessment of whether the volume of plastics had diminished.[20]

---

[16] Trial Tr., vol. 2, 390:7–12 ("How much was in the City's budget for the removal of plastics from these properties from 2021 to 2023?" "Zero." "Could any of the funds from the EPA grant be used to remove materials …?" "No, it could not."). See also Trial Tr. vol.2, 344:2-15 and vol. 4, 753:6-19.

[17] Trial Tr., vol. 2, 346:1–8 ("[W]e had very limited access to the building. Mr. Smith did not give us free access to the entire site"; "Did you try to take a police officer with you saying it's our building and bring police to the site to get access to your building?" "I did not.").

[18] Trial Tr., vol. 2, 346:17–25 ("[W]e submitted our closure in December of 2022"; "They were unable to complete a full assessment.").

[19] Trial Tr. Vol 4, 777:1-778:10

[20] Trial Tr., vol. 4, 859:2–10 ("None to my recollection"; "I don't know.").

20. Sickmann did not recall an assessment of the cost to move plastics and create lanes or firebreaks. He recalled possible estimates for total removal, but had no such estimates and described them as "mental estimates" by City representatives.[21]

21. Sickmann had no emails or documents showing work to determine how much product remained in 2022 or 2023.[22]

22. Mayor Snow testified that the City had not obtained a formal estimate at a meeting to remove the plastics. He also testified that he was unaware of any cost analysis or remediation plan to determine what the City could do.[23]

23. Snow could not specify the cost of removing the plastics.[24]

24. Snow testified that he did not believe the City would contemplate seizing Smith's assets and that storing or re-homing the plastics was not feasible.[25]

25. Sickmann testified that police could have accompanied Fields to the property if requested.[26]

---

[21] Trial Tr., vol. 4, 859:11–24 ("I don't have any recollect of creating lanes"; "I don't"; "I think these were mental estimates by city representatives to be taking a stab at what we think it might cost[.]").
[22] Trial Tr., vol. 4, 860:9–12.
[23] Trial Tr., vol. 3, 598:17–599:2 ("I was never in a meeting that discussed a formal estimate"; "Were you aware of any plans to remediate and demolish the 358 and 310 NW F Street Properties?" "There were no plans delivered to me like that, no.").
[24] Trial Tr., vol. 3, 590:22–591:7 ("I couldn't tell you what that would cost. I am positive it would be in seven figures…").
[25] Trial Tr., vol. 3, 591:3–12 ("I don't think there would have been a time that we would have contemplated seizing Mr. Smith's assets"; "[w]e would have to re-home them and then have our own holding place for them, which was not feasible.").
[26] Trial Tr., vol. 4, 853:14–19 ("Police could have been sent"; "I presume they would have gone, if asked.").

26. Smith denied threatening City employees with a gun and testified that he asked the visitors to identify themselves and use personal protective equipment because he wanted to keep his employees away from them and avoid injury.[27]

27. Smith testified that the City would not partner with him and had not told him it owned the properties and that he learned of the City's ownership by searching property records.[28]

28. This Court found that the City attempted to inspect its property but, after the City's attorney became involved, "apparently took no further action to remediate the known fire hazard and nuisance."[29]

29. This Court found evidence from which a reasonable jury could conclude that "reasonable persons would have done more to remediate a known fire hazard."[30]

30. This Court found evidence that the City's failure to remediate the known hazard "in part, led to the large scale fire" and caused Plaintiffs to evacuate their homes for approximately five days and incur monetary damages.[31]

**C. <u>The Fire, Evacuation, and Resulting Harm.</u>**

31. The evacuation was reported to have displaced more than 2,000 people from their homes and remained in effect until 4:00 p.m. on April 16, 2023.[32]

---

[27] Trial Tr., vol. 4, 900:7–17 ("There was no -- there was never no weapons"; "I asked them to identify theirselves and that they needed PPE … so that I could tell my guys to stay away from them so they didn't get hurt.").

[28] Trial Tr., vol. 4, 900:18–25 ("Do you feel that there was any sort of partnership or effort for – by the City tow ork with you to improve the condition of the property?" "I couldn't even get them to talk to me when they were coming on the property to do their thing. I mean, they -- nobody told me that they owned the property. I had to look on the SRI site … to be able to find out that they bought the site.").

[29] Trial Tr., vol. 3, 575:24–576:4.

[30] Trial Tr., vol. 3, 576:5–8.

[31] Trial Tr., vol. 3, 576:13–20.

[32] Trial Tr., vol. 2, 284:14–25: ("The fire forced the evacuation of over 2,000 people from their homes"; "[T]he evacuation order was lifted at 4 p.m. on April 16 of 2023.").

32. Stokes testified that the uncertainty and displacement increased her anxiety, disrupted her routine, and required her to plan meals and care for eight people while away from home.[33]

33. Fire Chief Brown testified that, during the fire, officials consulted the Emergency Response Guidebook because they did not know what was burning.[34]

34. Brown testified that the Guidebook led officials to a half-mile evacuation area for the unknown substance.[35]

35. Brown described the division of responsibility between the City and Wayne County. After he approved the evacuation, EMA took over the alerting and community updates.[36]

36. Brown testified that Wayne County EMA did not consult him again after seeking his initial opinion about whether to evacuate.[37]

37. Brown testified that first responders could modify the initial evacuation area based on the fire's magnitude, smoke, and wind direction, and could allow residents back into upwind areas.[38]

---

[33] Trial Tr., vol. 2, 437:6–16.

[34] Trial Tr., vol. 1, 159:14–24 ("We go to that for the evacuation areas, most commonly on hazardous materials and unknown substances. So with this being the case of the fire being—fire burning here, we really didn't know what was burning, so we looked up into the Guidebook – actually EMA looked up into the Guidebook for the unknown substances and came up with at the half-mile range for the evacuation.").

[35] Trial Tr., vol. 1, 159:21–24.

[36] Trial Tr., vol. 1, 160:7–19 ("[O]nce I gave the okay to do the evacuation, the Emergency Management Agency took over and took care of the evacuation"; "sending out the alerts and updating the community" was Wayne County EMA.).

[37] Trial Tr., vol. 1, 160:20–25; 161:1 (Asked whether he was further consulted after his initial opinion, Brown answered, "No.").

[38] Trial Tr., vol. 1, 161:9–20 ("It's up to us to modify the evacuation area". Factors include "the magnitude of the fire, where the smoke is going … the weather, the wind direction"; "if we have an upwind area, we'll allow the residents to come back to that area.").

38. Brown testified that he determined when the fire was extinguished. He said he made that determination on April 18, 2023, after no more smoke or flames were visible.[39]

39. Brown testified that most of the plastic material on the three properties was consumed in the fire and that he believed the burnt rubble was hauled to Randolph County.[40]

40. The City's Corporation Counsel, Sickmann, described the unsafe-building process as beginning with a preliminary order, followed by a hearing before the Unsafe Building Commission and a final order that could affirm, deny, or amend the preliminary order.[41]

41. Sickmann testified that the Unsafe Building Commission proceedings concerning the 310 and 358 properties occurred in 2019, and that he did not personally visit those properties during the proceedings.[42]

42. Smith disputed that the City had no arrangement for his continued occupancy. Although he acknowledged having no written lease with the City, he testified that he had an agreement with Sickmann to get product off the site.[43]

43. Smith testified that he had no deed to the 310 or 358 properties, paid no rent for use of 358, and paid no property taxes on either parcel.[44]

---

[39] Trial Tr., vol. 1, 158:17–159:3: ("The fire wouldn't be fully extinguished until we didn't see any more puffs of smoke coming from the ground and no more flames"; "That would be me.").
[40] Trial Tr., vol. 1, 159:4–10 ("Most of it was consumed in the fire"; "I believe they were hauled off to a location in Randolph County.").
[41] Trial Tr., vol. 4, 790:18–791:9 ("Then a hearing will occur within 30 days"; the Commission "will issue a final order" that "can either affirm the preliminary order, it can deny the preliminary order, or it could essentially affirm and amend that preliminary order.").
[42] Trial Tr., vol. 4, 791:10–22 ("It would have been in 2019"; asked whether he visited the properties, he answered, "No"; asked whether he was involved in the proceedings, he answered, "Yes.").
[43] Trial Tr., vol. 3, 661:17–23; 662:15–21 (Smith said he had no written lease for either parcel; when asked whether he had any agreement "verbal or otherwise" with the City after it took title, he identified an agreement with A.J. Sickmann. This Court separately found no evidence that the City transferred ownership or control to Smith. Trial Tr., vol. 3, 575:18–25).
[44] Trial Tr., vol. 3, 660:19–23; 661:5–16, 24–25; 662:1–2.

44. Smith testified that after the former Hoffco operation ended, the properties had open doors, windows, and gates, and that he observed recurring fire and police calls involving fires at the site.[45]

45. Smith denied threatening Fields with a weapon. He testified that he asked visitors to identify themselves and wear personal protective equipment so he could keep his employees away from them.[46]

46. Sickmann testified that police could have accompanied Fields to the property if requested.[47]

47. Fields testified that the City could not begin the grant work when awarded in 2018 because it lacked access to the U.S. Treasury's ASAP system.[48]

48. Fields testified that the City used Brownfields funds to complete an assessment at another site, the former Hagerstown Plastics facility, and that the site was ultimately demolished and closed out.[49]

---

[45] Trial Tr., vol. 4, 899:12–25; 900:1–5 ("[T]hey left the doors, the windows, the gates, everything in the facility was left open"; Smith described "daily calls, fire department, police department, sheriff departments … fires" and said, "It was rough.").

[46] Trial Tr., vol. 4, 900:6–17 ("That is not what took place. I asked them to identify theirselves and that they needed PPE … so that I could tell my guys to stay away from them so they didn't get hurt"; "There was no—there was never no weapons.").

[47] Trial Tr., vol. 4, 853:9–19 ("Police could have been sent"; "I presume they would have gone, if asked.").

[48] Trial Tr., vol. 2, 403:1–4 ("[W]e were awarded the funds in 2018, but because we couldn't get access to the U.S. Treasury's ASAP system, we weren't able to actually begin the work.").

[49] Trial Tr., vol. 2, 403:5–24 (Hagerstown "was determined to be eligible"; "We utilized funding to complete the assessment"; "It's closed out. The building has been demolished, and it's a Brownfield -- a Greenfield site now.").

49. Snow testified that he viewed the cost of removing the plastics as beyond what the City could absorb without seeking a Council appropriation, but he could not "tell you what that would cost."[50]

50. Snow testified that he was not aware of plans to redevelop the properties and that the City's 2019 comprehensive plan did not include that area.[51]

51. Snow testified that he had never attended a meeting discussing a formal estimate to remove the plastics and was unaware of a project budget for that removal.[52]

52. Sickmann testified that the City's law-department litigation budget was $15,000 and that adding funds required Council approval and an appropriation from another budget line.[53]

53. Craig testified that he had not seen a mental-health professional for anxiety from the fire, had not sought medical care for smoke inhalation, and was not making a lost-earnings claim.[54]

54. Craig testified that he stayed one night at the Quality Inn and that Stokes paid the hotel bill; he testified that he paid a friend $100 for a place to stay.[55]

---

[50] Trial Tr., vol. 3, 590:16–25.

[51] Trial Tr., vol. 3, 598:2–9: ("Are you aware of any plans to develop or redevelop the 358 and/or 310 NW F Street properties?" "No"; the 2019 plan "did not include that area.").

[52] Trial Tr., vol. 3, 598:10–22 (asked whether the City had a budget set aside, he answered "No"; asked whether the City obtained estimates, he answered, "I was never in a meeting that discussed a formal estimate of that removal.").

[53] Trial Tr., vol. 4, 789:18–790:7 ("It is $15,000"; "a request has to be made to the Richmond common council"; additional funds would require "taking from some other budget line item.").

[54] Trial Tr., vol. 3, 499:1–16 (Craig answered "No" when asked whether he had seen a mental-health professional, a doctor, or another medical provider, and answered "No" when asked whether he claimed lost earnings or loss of earning capacity.).

[55] Trial Tr., vol. 3, 505:12–506:3 (Craig confirmed "One night at Quality Inn and Suites"; when asked whether he paid the $99.68 hotel bill, he answered "Correct" to "you didn't pay"; he then confirmed paying his friend $100, splitting the amount owed with Stokes.).

55. This Court stated that Smith testified he was willing to work with the City and had removed millions of pounds of plastic after being told to do so, while also finding that the City had not meaningfully investigated whether it could stop the nuisance.[56]

## II. CONCLUSIONS OF LAW

1. The City bears the burden of proving that a statutory immunity applies and that immunity must be narrowly construed. *See Peavler v. Board of Commissioners*, 528 N.E.2d 40, 46 (Ind. 1988); *Schoettmer v. Wright*, 992 N.E.2d 702, 706 (Ind. 2013).[57] The trial evidence confirms that the City had no written estimate, no assessment of firebreak alternatives, and no documented effort to determine whether the hazard could be reduced.[58]

2. This Court's pretrial rulings rejected the City's contention that Plaintiffs' claims were merely claims for failure to enforce the 2019 orders.[59] At trial, this Court reiterated that, on Plaintiffs' negligence claim, the issue concerned whether "reasonable persons would have done more to remediate a known fire hazard."[60] This Court should adhere to those rulings on the same legal theories.

3. The City's motion improperly equates the evacuation with the alleged tort. Plaintiffs do not challenge the Fire Chief's tactical decision to issue an evacuation order. They allege that the City's pre-fire failure to remediate the known hazard caused the large-scale fire

[56] Trial Tr., vol. 5, 963:3–6, 18–25 ("Mr. Smith testified that he was willing to work with the City, albeit through his attorney. The City would not even talk to Mr. Smith or work with him or even attempt to help remedy the nuisance." He was "actively working to remedy the issue" and "removing millions of pounds"; the City's unsupported guess that it could not stop the nuisance was "not enough" without determining whether it was possible or working with Smith.).
[57] *See also* Order on Summary Judgment (ECF No. 304 at 36).
[58] Trial Tr., vol. 4, 859:11–24; 860:9–16.
[59] Order on Summary Judgment (ECF No. 304 at 37); Order on Pending Motions (ECF No. 324 at 19).
[60] Trial Tr., vol. 3, 576:5–8 (finding that the evidence was "legally sufficient for a reasonable jury to conclude that reasonable persons would have done more to remediate a known fire hazard.").

and consequent displacement. This Court expressly found evidence that the City's failure to remediate "in part, led to the large scale fire" and the approximately five-day evacuation.[61]

4. The jury's finding of negligence is consistent with this Court's trial ruling that reasonable persons could have done more to remediate the known fire hazard.
5. Discretionary-function immunity under Indiana Code § 34-13-3-3(a)(7) applies only to protected planning decisions, not every judgment or omission by a government employee. The City must show a policy decision made by conscious balancing of risks and benefits. *Peavler*, 528 N.E.2d at 45-46. The evidence of informal, undocumented "mental estimates," with no review of firebreaks or other mitigation, does not establish such a decision.[62]
6. The City's seven-figure estimate does not establish discretionary immunity. Snow could not identify a specific cost, no formal estimate was presented to the Common Council, and he acknowledged no cost analysis or remediation plan was performed.[63] Those facts do not show an official, informed balancing of the risk posed by a known fire hazard against identified alternatives.
7. The operational omissions at issue were distinct from the City's policy decision to acquire Brownfield property. Plaintiffs do not challenge the acquisition of title. They challenge the City's failure, after taking title and learning of the hazard, to use reasonable care to reduce it. The City's attorney testified that he was unaware of any attempt to revisit the properties

[61] Trial Tr., vol. 3, 576:13–20.
[62] Trial Tr., vol. 4, 859:11–24.
[63] Trial Tr., vol. 3, 590:22–591:7; vol. 3, 598:17–22; vol. 5, 963:12–17.

after August 5, 2021 and was unaware of any assessment that was performed on creating lanes or firebreaks.[64]

8. The City's Brownfields defense does not bar these claims under Indiana Code § 34-13-3-3(a)(22). That provision covers an "act taken to investigate or remediate" a Brownfield. Plaintiffs' claim is based on the City's inaction after it acquired the properties, not on the City's act of taking title or performing an assessment. This Court previously held that "a claim premised on *inaction* is not barred" by this provision and that keeping one's property safe is not an act to investigate or remediate a Brownfield.[65] Further, the trial record confirms that grant funds could not be used to remove plastics and that the City took no further action to remediate the known fire hazard.[66]

9. The City is not entitled to non-enforcement immunity under Indiana Code § 34-13-3-3(a)(8). The claim is not that the City failed to compel Smith's obedience to a law, it is that the City failed to exercise reasonable care over property it owned and controlled. As this Court found, there was no evidence that Smith was a tenant or had permission to occupy the parcels, and found that the City had not transferred ownership or control.[67]

10. The third-party-acts immunity in Indiana Code § 34-13-3-3(a)(10) does not immunize the City from its own negligence or for failing to abate a nuisance on its property. Although Cornerstone owned and accumulated the plastics, the City independently owned the 310 and 358 properties and, as this Court found, knew of the hazard and failed to remediate it.

---

[64] Trial Tr., vol. 4, 859:2–16.

[65] Order on Summary Judgment (ECF No. 304 at 40) ("Logic dictates that a claim premised on *inaction* is not barred by a provision barring claims for "an act taken." Ind. Code § 34-13-3-3-(a)(22)."

[66] Trial Tr., vol. 2, 390:7–12; vol. 3, 576:2–4.

[67] Trial Tr., vol. 3, 575:18–25.

Indiana Code § 34-13-3-3(a)(10); *Henshilwood v. Hendricks County*, 653 N.E.2d 1062, 1066 (Ind. Ct. App. 1995).[68]

11. The City's inspection-immunity defense under Indiana Code § 34-13-3-3(a)(12) is inapplicable because that provision concerns inspection of property other than government property. The City owned 310 and 358. The testimony also established that the City did not pursue access with police and that police could have accompanied the City's representative if asked.[69]

12. The City's fire-protection and emergency-communications immunities do not dispose of Plaintiffs' claims. The claims concern the pre-fire condition and the City's failure to remediate a known hazard, not the adequacy of firefighting tactics, the issuance of the evacuation order, or the operation of an emergency-communications system. This Court found that the City's failure to remediate contributed to the fire and resulting evacuation.[70]

13. The absence of an identified ignition source does not defeat the causal theory submitted to the jury. Gardner testified that the massive accumulation of plastics was necessary fuel for the fire to become what it did, regardless of the ignition source.[71]

14. This Court has already determined that the evidence is sufficient to support the nuisance claim. It found that a jury could conclude the City's failure to remediate the known hazard "constitutes an interference with the plaintiffs' comfortable enjoyment and use of their property."[72]

---

[68] Trial Tr., vol. 3, 511:14–18; 576:13–20.
[69] Trial Tr., vol. 2, 346:1–8; vol. 4, 853:14–19.
[70] Trial Tr., vol. 3, 576:13–20.
[71] Trial Tr., vol. 2, 324:16–20.
[72] Trial Tr., vol. 3, 576:9–13.

15. The City's post-trial request for judgment should be denied. This Court denied the City's Rule 50 motions after finding the evidence legally sufficient on negligence and nuisance, and it specifically identified the City's own failure to remediate as evidence supporting both claims.[73] This Court should enter judgment on the jury's verdict against the City.

16. The trial record supports separating the emergency evacuation from the pre-fire conduct challenged in the claims. Brown testified that he and EMA made the evacuation decision because the material burning was unknown, and that EMA took over alerts and community updates after he gave approval.[74] This Court identified the City's pre-fire failure to remediate as the conduct supporting negligence and nuisance.[75]

17. This Court's sufficiency ruling is supported by the record on control and duty. It found no evidence that Smith was a tenant or that the City had transferred control of its properties to him, and it found that the City "apparently took no further action to remediate the known fire hazard and nuisance."[76] This Court then held the evidence legally sufficient for a jury to find that reasonable persons would have done more.[77]

18. The evidence does not establish an informed operational assessment of the continuing hazard. Sickmann could not recall a post-August 2021 site visit or an assessment in 2022 of whether the plastic inventory had diminished; he recalled no cost assessment for creating lanes or firebreaks.[78] He identified no written estimate and described pre-fire estimates as "mental estimates."[79]

---

[73] Trial Tr., vol. 3, 576:5–24.
[74] Trial Tr., vol. 1, 159:11–24; 160:7–19.
[75] Trial Tr., vol. 3, 575:24–576:20.
[76] Trial Tr., vol. 3, 575:18–576:4.
[77] Trial Tr., vol. 3, 576:5–8.
[78] Trial Tr., vol. 4, 859:2–19.
[79] Trial Tr. vol. 4, at 859:20–24.

19. The City presented evidence of significant financial and logistical concerns, which This Court may consider, but the record also shows that those concerns were not quantified through a formal estimate or remediation plan. Snow said removal would be "unbelievably costly" and likely seven figures, but could not identify the amount; he had never been in a meeting about a formal estimate.[80] This Court noted that no cost analysis or remediation plan had been performed to determine whether the City could abate the nuisance.[81]

20. Discretionary-function immunity requires proof of the kind of policy decision protected by Indiana Code § 34-13-3-3(a)(7), not merely evidence that public resources are limited. *See Peavler v. Board of Commissioners*, 528 N.E.2d 40, 46 (Ind. 1988); *City of Indianapolis v. Duffitt*, 929 N.E.2d 231, 236–42 (Ind. Ct. App. 2010); *Routh v. Kappe*, No. 25A-PL-2593, slip op. at 8–10 (Ind. Ct. App. May 7, 2026). Here, the City's witness testified that there was no assessment of the cost to create lanes or firebreaks and no written cost estimate.[82]

21. Brownfields immunity under Indiana Code § 34-13-3-3(a)(22) does not convert all post-acquisition conduct into an immune act of investigation or remediation. The trial court had already ruled that a claim based on inaction was not barred by that provision. At trial it reiterated that the City took title to remediate and demolish, but then did not further remediate the known hazard.[83] The evidence also showed that grant funds could not be used to remove the plastics.[84]

22. The City's evidence concerning limited access and Smith's resistance does not establish that the City lacked practical means to pursue access or coordination. Fields testified she

[80] Trial Tr., vol. 3, 590:17–25; 591:1–12; 598:17–22.
[81] Trial Tr., vol. 5, 963:12–25.
[82] Trial Tr., vol. 4, 859:11–24.
[83] Trial Tr., vol. 3, 575:1–4; 576:1–4; vol. 5, 963:8–17.
[84] Trial Tr., vol. 2, 390:7–12.

did not try to take a police officer to the site, and Sickmann testified that police could have accompanied her if asked.[85] This Court also noted Smith's willingness to work through counsel and stated that it was not enough for the City to guess it could not stop the nuisance without determining whether it could or attempting to work with Smith.[86]

23. The City's non-enforcement defense under Indiana Code § 34-13-3-3(a)(8) does not resolve the independent premises-liability theory submitted to the jury. This Court found that Smith was not a tenant and that no transfer of ownership or control had been shown.[87] It identified the City's own failure, after acquiring the property, to remediate the known hazard as evidence supporting the claims.

24. The presence of third-party conduct does not negate the evidence of the City's own alleged breach. The parties stipulated that Cornerstone owned the plastics, but the City owned the 310 and 358 properties and This Court found it knew of the accumulated plastics and associated fire hazard.[88] Indiana Code § 34-13-3-3(a)(10) does not afford immunity for the City's independent conduct as a property owner. See Henshilwood v. Hendricks County, 653 N.E.2d 1062, 1066 (Ind. Ct. App. 1995).

25. The City's inspection-immunity argument under Indiana Code § 34-13-3-3(a)(12) does not dispose of a claim concerning the City's own property. The City held title to 310 and 358, and Fields testified that she did not request police assistance to access the site.[89] Sickmann testified police could have accompanied her.[90]

[85] Trial Tr., vol. 2, 346:1–8; vol. 4, 853:14–19.
[86] Trial Tr., vol. 5, 963:3–5, 18–25.
[87] Trial Tr., vol. 3, 575:18–25.
[88] Trial Tr., vol. 3, 511:14–18; 576:13–20.
[89] Trial Tr., vol. 3, 510:25–511:2; vol. 2, 346:1–8.
[90] Trial Tr., vol. 4, 853:14–19.

26. The evidence supports causation even though the precise ignition source was not identified. Gardner testified that every fire requires fuel and that the fire required the massive volume of petroleum plastics across the three parcels "regardless of whether it was a hot forklift or a cigarette butt."[91] This Court found evidence that the City's failure to remediate the hazard contributed to the large-scale fire.[92]

27. The record supports the jury's nuisance finding. This Court expressly found the evidence legally sufficient for a jury to conclude that the City's failure to remediate the known fire hazard interfered with Plaintiffs' comfortable enjoyment and use of their property.[93] Stokes described the anxiety and disruption caused by losing access to her home and routines.[94]

28. The evidence of damages is not limited to physical injury or medical treatment. Craig testified to lodging and displacement expenses, and Stokes described anxiety, loss of routine, and the burden of caring for eight people away from home.[95] Craig also testified that he did not seek medical treatment for smoke inhalation or claim lost earnings.[96]

29. The City's Rule 50 request should be denied. This Court already found the evidence sufficient on both negligence and nuisance and denied the defendants' Rule 50 motions.[97] This Court's trial ruling identifies the factual basis: City ownership, actual knowledge of the plastics and fire hazard, failure to remediate, and evidence linking that failure to the fire, evacuation, and damages.[98]

---

[91] Trial Tr., vol. 2, 324:5–20.
[92] Trial Tr., vol. 3, 576:13–20.
[93] Trial Tr., vol. 3, 576:9–13.
[94] Trial Tr., vol. 2, 437:6–16.
[95] Trial Tr., vol. 3, 505:12–25; vol. 2, 437:6–16.
[96] Trial Tr., vol. 3, 499:1–15.
[97] Trial Tr., vol. 3, 576:5–24.
[98] Trial Tr., vol. 3, 576:13–20.

.

Respectfully submitted,

**/s/ John A. Smalley**
John A. Smalley, Esq. (OH Sup. Crt. 0029540)
Attorney for Plaintiffs
131 N. Ludlow Street, Suite 1400
Dayton, OH 45402
Telephone: (937)223-8888
Facsimile: (937) 824-8630
Email: jsmalley@dgmslaw.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing pleading has been filed this 23rd day of October, 2026 with the Clerk of Court using the CM/ECF system, which will send notification to the following counsel of record:

Andrew M. McNeil
Bradley R. Sugarman
Jackson L. Schroeder
Seth M. Thomas
Bose McKinney & Evans, LLP
111 Monument Circle, Suite 2700
Indianapolis, IN 46204
Attorneys for City of Richmond

Arie Lipinski
LIPINSKI LAW
951 N. Delaware Street
Indianapolis, IN 46202-3377
Attorneys for Seth Smith, Cornerstone Trading
Group, LLC, and My-Way Trading, Inc.

**/s/ John A. Smalley**
John A. Smalley, Esq. (OH. Sup. Crt. 0029540)
Attorney for Plaintiffs